**GREAT ATLANTIC LIFE INSURANCE COMPANY, Appellant,**

v.

**Anthony G. HARRIS, Receiver for United Bankers Life Insurance Company, et al., Appellees.**

No. 14519.

Court of Appeals of Texas, Austin.

Jan. 14, 1987.

Rehearing Denied Feb. 11, 1987.

Mary Joe Carroll, David C. Duggins, Clark, Thomas, Winters & Newton, Austin, for appellant.

James T. Odiorne, Successor Receiver to Anthony G. Harris, Austin, Receiver for United Bankers Life Ins. Co.

Mauro L. Reyna, III, Austin, for Receiver.

Stuart M. Reynolds, Jr., Mark David, Moore & Peterson, Dallas, for Southern Nat. Life Ins. Co.

Before SHANNON, C.J., and GAMMAGE and CARROLL, JJ.

## ON MOTION FOR REHEARING

GAMMAGE, Justice.

The prior opinion and judgment of this Court, dated November 5, 1986, are withdrawn, and the following is substituted therefor.

Great Atlantic Life Insurance Company (GAL) appeals from a take-nothing judgment rendered by the district court. We will reverse the judgment of the district court and render judgment in favor of appellant.

This case arises from the sale on January 22, 1981 of GAL to Roger Dean Enterprises, Inc. (Dean), owner of various automobile dealerships. Prior to the sale, GAL was owned 95.1% by Southern Educators Life Insurance Company and 4.9% by Southern National Life Insurance Company (SNL), an appellee. The principal spokesman in negotiating the sale for the sellers was Tom Kalim, executive vice president of SNL and an officer of GAL at that time. The principal spokesman for Dean was Warren White, certified public accountant and financial advisor to Dean.

Dean's automobile dealerships, in connection with automobile financing, had been selling credit life and disability insurance for many years through insurance companies not owned by Dean. Dean wished to purchase a small insurance company (GAL) in order to capitalize on this "captive business." As part of the negotiations for the sale of GAL to Dean, representatives of SNL told Dean that a reinsurance agreement was necessary so that GAL would have the financial capacity to underwrite all of the anticipated business generated by Dean's automobile dealerships. "Reinsurance", in simple terms, is a means whereby a company that issues an insurance policy can allocate all or a portion of the risk it bears on that policy to another insurance company in return for a portion of the premium. It has been defined as:

> the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss. The true reinsurer is merely an insurance company or underwriter which deals only with other insurance companies as its policyholders....

Appleman, Insurance Law and Practice § 7681, at 480 (1976).

On the day before the sale of GAL to Dean, two reinsurance agreements were executed. One agreement was between GAL and United Bankers Life Insurance Company (UBL). The other was between UBL and SNL. Two agreements were necessary because GAL is a Florida corporation and SNL is a Texas corporation not licensed to reinsure in Florida. UBL is licensed by both Texas and Florida and was used as an intermediary, or pass-through company, in order to accommodate the transaction. Both agreements were drafted by Kalim, who repeatedly testified at trial that they were mirror agreements intended to accomplish one objective—reinsurance of GAL policies by SNL. At trial, Kalim explained the transaction as follows:

> A. They [Dean and White] were rather neophytes in the insurance business, and did not understand all the ramifications of reserves and reinsurance. And in order to assure them that it was a sound buy, we sat down and showed them that we would reinsure the business at Southern National, thereby relieving their liability and the risk....

\* \* \* \* \* \*

Q. Can you, in a little more detail, tell the jurors what you said in regard to [what] we would reinsure at Southern National? What you mean by that.

A. We, at Southern National, would reinsure [GAL] so that they would not have a negative cash flow. It would allow them the advantage of having an insurance company without having to post all of the reserves, give them a positive cash flow on the front side of the deal, and allow them to get a return on their investment until such time as they got their surplus built up.

Q. Did you tell them—did you tell Mr. Dean or Mr. White who would post the reserves if Great Atlantic didn't have to?

A. The reinsurer.

Q. Okay. And was that Southern National?

A. At that time it was Southern National. And in order to put that into place we needed an intermediate or if you will, in the vernacular of the trade, a pastor [pass-through], which a pastor [pass-through] is a company that has a passive action. They assume no risk. Their reserves go up and come down automatically. They are to receive a small pass-through fee for doing a passive agreement which makes the deal a legal transaction. And it's done everyday in the insurance day. The risk is maintained by the ultimate reinsurer. And, as we explained to Great Atlantic, the ultimate reinsurer was going to be Southern National. However, Southern National's size at the time was not any bigger to me than Great Atlantic's, and Southern National had a treaty with a larger company called Agripinna. And we had specimens of irrejectable letters of credit, irrevocable letters of credit backing up Southern National, which gave Great Atlantic a comfort factor. There were reserves there to pay any claim should

anything ever go wrong if the losses exceeded the reserves.

\* \* \* \* \* \*

A. We had to draft two agreements; one between Great Atlantic and UBL, and one between UBL and Southern National. And the reason for the drafting of that type is these two documents had to track each other so that the money flowed, would flow the same on both treaties. One track the other one.

Q. What was the purpose of having the money flow the same? Was [sic] there any funds to be left at United Bankers?

A. Yes. As I recall, there was a half a point to be left, half a point of the premium was to be left at United Bankers. And at this point I am not really sure whether or not that half a point was on cash flow or was on the net written premium. I believe it was the cash flow.

Q. What was the half a point compensation for? What was United Bankers supposed to do to earn that compensation.

A. Accommodate a transaction between Great Atlantic Life and Southern National. They were merely accommodating. . . .

Administrative duties connected with the reinsurance were performed at the SNL office by SNL employees. UBL performed virtually no administrative functions and UBL bore no risk in the transaction. A representative of UBL signed the agreements, but it appears that no representative of UBL was present during the negotiations between Dean and GAL/SNL.[1]

All three companies operated pursuant to the agreement from approximately January 1981 to October 1981 when UBL was placed in receivership by the State of Texas. GAL then terminated its reinsurance agreement with UBL/SNL. UBL and SNL, however, were still bound to honor the reinsurance agreement with regard to policies in force before the agreement was terminated. This is known in the insurance industry as "run-off business." As GAL

1. Walter Franks and Raymond Howell apparently are stockholders in both SNL and UBL, and both were present during at least one of the meetings. Their role in the negotiations, however, is unclear from the record.

paid claims on reinsured policies or refunded premiums on cancelled policies, GAL requested reimbursement from UBL/SNL pursuant to the reinsurance agreement. Most of these claims, however, were not paid.

Consequently, GAL brought suit against both UBL and SNL. UBL's receiver filed a general denial and cross-claim against SNL for the value of the "run-off" business. SNL originally brought a counterclaim and cross-claim in interpleader, but obtained a nonsuit on the interpleader before trial. SNL's amended answer denied liability on various grounds. The district court entered judgment, based on the jury's responses to special issues, that GAL take nothing and that the receiver for UBL receive from SNL the sum of $265,639.94, the amount of the run-off obligation.

GAL asserts in its first point of error that the trial court erred in refusing to hold as a matter of law that the two reinsurance contracts, when read together, were intended to pass through all reinsured liability and risk from GAL to SNL, with UBL acting only as a "front," and that the run-off obligation was owed to GAL and not to the receiver of UBL. We agree.

Reinsurance agreements are subject to the general law of contracts. *Cunningham v. Republic Insurance Company*, 127 Tex. 499, 94 S.W.2d 140, 142 (Tex.Comm. App.1936, jdgmt. adopted); *Stradley v. Southwestern Life Insurance Company*, 341 S.W.2d 195, 198 (Tex.Civ.App.1960, writ ref'd n.r.e.); *Prudential Insurance Company v. Associated Employers Lloyds*, 250 S.W.2d 477, 480 (Tex.Civ.App. 1952, no writ).

Appellees argue that there is no contract between SNL and GAL, that SNL's only contractual obligation is to UBL, and that obligation has been fulfilled. Appellees further argue that GAL is bound by the jury finding that GAL was not the intended beneficiary of the UBL–SNL contract. In support of their position, appellees cite *McFarling v. Mayfield*, 510 S.W.2d 108 (Tex.Civ.App.1974, writ ref'd n.r.e.). In *McFarling*, the court held that the holder

of an insurance policy issued by an insolvent insurer was not entitled to direct payment of the proceeds by the reinsurer where the reinsurance agreement contained no specific language establishing direct liability of the reinsurer to the original insured. In other words, in the absence of express contractual language to the contrary, the original insured (policy holder) is not an intended third-party beneficiary to a contract between the original insurer and its reinsurer.

We agree with the holding in *McFarling*, but find it inapplicable to this case. The policy holder in *McFarling* was a stranger to the reinsurance agreement. Generally, reinsurance is intended to protect the original insurer and not necessarily an individual policy holder. In this case, GAL was the original insurer and not an individual policy holder or a stranger to the reinsurance agreement. The contract negotiations in this case were directly between Dean (now GAL) and SNL. UBL's role appears to have been entirely passive. Representations by SNL were made to Dean, not to UBL, in order to accomplish the sale of GAL to Dean.

UBL and SNL would now have us construe the two contracts as two separate and distinct transactions—as though they were unrelated. We think this is illogical and hold that the GAL–UBL and UBL–SNL agreements should be construed as one contract.

> The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62, 65 (1959); *Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (1942); *Braniff Inv. Co. v. Robertson*, 124 Tex. 524, 81 S.W.2d 45, 50 (1935); *Libby v. Noel*, 581 S.W.2d 761, 764 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.).

*Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981); followed in *Jim Walter Homes, Inc.*

*v. Schuenemann,* 668 S.W.2d 324, 327 (Tex.1984).

This rule applies even where the contracts may not be between the same parties. *Miles v. Martin, supra* at 66; *American Petrofina, Inc. v. PPG Industries, Inc.,* 679 S.W.2d 740 (Tex.App.1984, writ dism'd by agrmt.). *American Petrofina* is particularly interesting in light of its facts. In that case, PPG, a glass manufacturer, executed a contract on August 28, 1977 with Ayres, providing that Ayres would sell to and store for PPG 3,000,000 gallons of diesel fuel. On September 1, 1977, Ayres, in turn, entered into a contract with Fina to purchase the 3,000,000 gallons of diesel fuel. The court held that:

> [t]he trial court properly concluded as a matter of law that the two contracts should be construed together and treated as one contract, the rule being that separate contracts executed at the same time, for the same purpose and in the course of the same transaction are to be considered as one instrument and this may be so even though they are not between the same parties....
>
> The contracts when construed together, in the light of the acts of the parties, constitute a transaction in which the consideration flowed from PPG in the form of the full purchase price and PPG in turn received the bargained-for consideration in the form of title to and ownership of three million gallons of the diesel oil then contained in Fina's tanks.

*Id.* at 751–52.

It is clear in the case before us that the two reinsurance agreements were executed "at the same time, for the same purpose, and in the course of the same transaction," as contemplated in *Jones v. Kelley, supra.* They were drafted by the same person as "mirror agreements" and were executed on the same day as part of the same transaction—the sale of GAL to Dean. We will therefore construe them as one instrument.

Because we hold as a matter of law that there is a single contract expressed through two instruments between SNL and GAL, we need not address appellees' argu-ment that GAL is not a third-party beneficiary of the contract between UBL and SNL. In light of this holding, the jury's finding on that issue also becomes irrelevant.

It is an elementary principle of law that a contract should be construed, if at all possible, to comport with the intent of the parties. *Skelly Oil Company v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1962). It is apparent from our review of the two instruments and the record as a whole that all three parties intended SNL to be the ultimate reinsurer of GAL, backed by SNL's letters of credit from Agrippina. UBL was passively interposed between the two, for a small consideration, only to satisfy a legal formality.

Excerpts from the reinsurance agreement *between UBL and SNL* are reproduced below to illustrate that the true contracting parties were GAL (Dean) and SNL, with UBL acting only as a passive intermediary:

> ARTICLE I. 1. UBL agrees to automatically cede to SNL and SNL agrees to automatically accept on a reinsurance basis (a) eighty percent (80%) of the credit accident and health insurance liability under each and every certificate or policy of credit insurance issued by GREAT ATLANTIC LIFE INSURANCE COMPANY ("GAL"), a life insurance company organized under the laws of the State of Florida.... The liability to be automatically ceded and assumed hereunder is the liability which is to be automatically ceded by GAL and assumed by UBL pursuant to the terms of that certain Reinsurance Agreement dated January 21, 1980 between UBL and GAL, as amended....
>
> ARTICLE II. 1. Within twenty-five (25) days following the close of each calendar month during the term of this Agreement, GAL will pay to UBL reinsurance premiums applicable to the preceding calendar month, determined in the following manner: ...
>
> ARTICLE III. 1. UBL shall be reimbursed by SNL for the reinsured portion

of incurred claims and allocated claim expenses. . . .

ARTICLE IV. 1. SNL will fund and maintain proper reserves against all liabilities under policies and certificates reinsured under this Agreement in an amount equal to the reserves required under and in accordance with the provisions of the Texas Insurance Code. . . .

ARTICLE V. During the term of this Agreement, SNL shall be responsible for the initial processing of all credit life and credit accident and health insurance written by GAL and reinsured hereunder and for the administration and payment of all claims thereunder. . . .

ARTICLE VII. GAL has furnished to UBL and UBL has furnished to SNL specimen forms and agreements under or upon which policies and certificates reinsured hereunder shall be written, and UBL will promptly notify SNL of all changes in said forms. Although SNL shall handle the supervision and payment of all claims under said policies and certificates, *SNL shall be bound as GAL is bound* in accordance with the terms and conditions of said policies and certificates. (emphasis added).

It is apparent from reading both instruments that GAL generated the premiums which flowed under the contract to SNL. SNL, in turn, was obligated by the terms of the contract to reimburse GAL, through UBL, for a certain portion of claims paid out and premiums refunded. UBL assumed no risk and performed virtually no administrative functions. SNL posted the required reserves and SNL employees processed the paper work.

In return for the use of its license, UBL received a half point of the premiums. It is undisputed that UBL was paid what it was entitled to receive under the contract for the run-off business. The judgment of the trial court awarded to UBL's receiver a windfall not anticipated by the parties or provided for in the contract when read as a whole.

Appellees argue that the following provision in the contract between UBL and SNL is dispositive of this case:

ARTICLE IX. 1. In the event of the insolvency of UBL, all reinsurance shall be payable directly to its liquidator, receiver or statutory successor, without diminution because of the insolvency of UBL.

We read this provision merely to say that all reinsurance to which UBL may be entitled shall be payable to its receiver. In this instance, UBL is not entitled to the funds in question under the contract. UBL is only entitled to a half-point commission on premiums, which it has already received. We decline to construe this provision to give UBL's receiver authority to collect funds to which UBL would not be entitled if it were not in receivership.

The jury found that the amount owed on the run-off obligation of SNL pertaining to GAL business is $265,639.94. That amount is not disputed before this Court. Because we find that SNL had a contractual obligation to pay this amount to GAL, we reverse the judgment of the district court and render judgment that Anthony G. Harris, receiver for United Bankers Life Insurance Company, take nothing by its claim against Southern National Life Insurance Company, and that Great Atlantic Life Insurance Company recover from Southern National Life Insurance Company the amount of $265,639.94, together with interest thereon from April 18, 1985 at the rate of ten percent per annum until paid. Tex. Rev.Civ.Stat.Ann. art. 5069–1.05 (Supp. 1986).

Because we sustain appellant's first point of error, we need not reach the remaining two points of error.