[No. B094721. Second Dist., Div. One. June 14, 1996.]

CHARLES QUACKENBUSH, as Insurance Commissioner, etc., Plaintiff and Respondent, v.
MISSION INSURANCE COMPANY, Defendant;
MARK BOOZELL, as Insurance Director, etc., et al., Claimants and Appellants.

460

## COUNSEL

Sidley & Austin, James M. Harris, Thomas E. Patterson, Catherine Valerio Barrad, Robert A. Holland, James R. Stinson, Peter Gallanis, Debra J. Hall, George M. Brady III, Anthony J. Mormino, Rudnick & Wolfe, Stephen W. Schwab, J. Douglas Baldridge, Elizabeth A. Graber, Pachulski, Stang, Ziehl & Young, Iain A. W. Nasatir, Katten, Muchin, Zavis & Weitzman, Stuart M. Richter, Melody Williams Dapp, Katten, Muchin & Zavis, Donald E. Egan, Clay A. Tillack, Mendes & Mount and Mark S. Facer for Claimants and Appellants.

William W. Palmer, Rubenstein & Perry, Karl L. Rubinstein, Dana Carli Brooks and Melissa S. Kooistra for Plaintiff and Respondent.

## OPINION

**ORTEGA, J.**—Pursuant to the Insurance Code, Insurance Commissioner Charles Quackenbush (Commissioner) assumed responsibility for managing the insolvency of Mission Insurance Company (Mission), a defunct insurer. Mission both bought and sold reinsurance, in which the reinsured contracted with other insurance companies to exchange some of its policyholders' premiums for indemnity against covered losses incurred by its insureds. The relevant policies provided property and casualty liability coverage if specified events occurred, as opposed to life or disability coverage. Many of the policies had "long tails," which meant that a coverage claim from the original policyholder to its insurer, for which the original insurer would seek reimbursement from its reinsurer, such as for environmental pollution, could occur long after the triggering event (the actual dumping of pollutants, for example) and expiration of the policy. These potential, but not yet filed, coverage claims, liability for and the amount of which are unknown, are called *incurred but not reported* (IBNR) losses.

Over objections, the Commissioner proposed, and the trial court approved, an insolvency plan permitting him to estimate future IBNR losses for which Mission's reinsurers would be liable, although liability for, and the exact amount of, such losses remained undetermined. Under the plan, Mission's reinsurers would have to pay the estimated amounts into Mission's insolvent estate. The Commissioner would use this additional money to increase Mission's asset pool. The Commissioner then would distribute pro rata shares of Mission's asset pools to its creditors and conclude Mission's insolvency proceedings. Some of Mission's reinsurers and other interested parties appeal, repeating their trial court arguments that statutes prohibit future IBNR loss estimates and current payment of such estimated losses into an insolvent insurer's estate for immediate distribution to creditors. Rather, Mission's reinsurers argue, their liability for, and the exact amount of, future IBNR losses must await resolution of those issues.

We agree with appellants that the Commissioner's plan violates Insurance Code section 1025[1] because that section prohibits him from ordering payment of estimated future IBNR losses until liability for them, and their exact amount, are known. We reverse the court's order upholding the plan, and remand the matter for the trial court to order the Commissioner to submit a new plan which complies with section 1025.

## BACKGROUND

Insurance policyholders pay premiums to insurance companies in exchange for coverage against specific risks defined in their policies. In order to insure against the risk of having to pay large numbers of covered claims, insurance companies buy reinsurance, in which the reinsured company pays a portion of its collected premiums to the reinsurer in exchange for a right to indemnity from the reinsurer for payment of covered claims to the reinsured company's policyholders. Reinsurers often purchase additional reinsurance policies, known as retrocessional reinsurance, in which they exchange some of the premiums received from the original insurers in exchange for a right to indemnity from the retrocessional insurer for payments to the original

---

[1]Unless otherwise noted, all further section references are to the Insurance Code.

An order approving a final plan for an insolvent insurer is appealable. (Code Civ. Proc., § 904.1 subd. (a)(1); *Carpenter* v. *Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 322-323 [74 P.2d 761].) The appellants are the Illinois Insurance Director, who is managing the insolvency of Centaur Insurance Company, an Illinois reinsurer of Mission; the Reinsurance Association of America (RAA), a nonprofit reinsurers' trade association, some of whose members are Mission reinsurers; Borg-Warner Corporation, Centaur's parent company; and Certain Underwriters at Lloyd's, London and CNA International Reinsurance Company, Ltd., additional Mission reinsurers.

reinsured company. When companies buy reinsurance, they deduct the extra protection from their liabilities, effectively raising reserves or lowering potential liability. (§§ 922.1, 922.15.) By spreading companies' risk, reinsurance allows more policies to be written, making insurance more widely available at lower cost.

Under reinsurance policies, the reinsurer becomes obligated to pay only when the original insurer actually pays its policyholder for a covered claim. Such policies also require the original insurer to provide the reinsurer notice and an opportunity to contest both liability and the claim's amount. Three types of losses are covered under such policies. *Paid losses* occur when the original insurer actually pays a claim to its insured, reports the claim and payment to the reinsurer, and the reinsurer reimburses the original insurer under the reinsurance contract. *Outstanding losses* involve loss claims reported by a policyholder to the original insurer, who likewise reports the claim to the reinsurer,·but which have not yet been paid. The amounts of outstanding losses may change before they are paid. *IBNR* involve losses from accidents or occurrences which have already happened but for which the insurer has not received notice or loss reports. Liability for, and the amount of, IBNR losses have not yet been determined.

Problems arise when the original insurer becomes insolvent. Absent contrary language in the reinsurance policy, a reinsurer need not pay the insolvent original insurer until the original insurer actually pays its policyholder for a covered claim. (See *Fidelity & Deposit Co.* v. *Pink* (1937) 302 U.S. 224, 227-230 [82 L.Ed. 213, 215-217, 58 S.Ct. 162].) Because an insolvent original insurer frequently cannot pay its policyholders' covered claims, this requirement often results in nonpayment to insureds for covered claims, thus defeating the purpose of insurance and unfairly saddling the insured with the cost of what should have been a covered loss.

The Insurance Code authorizes the Commissioner to manage an insolvent insurer's affairs and liquidate it if it no longer can operate profitably. Section 1011 permits the Commissioner to seek a court order appointing him conservator of an insolvent insurer. Section 1016 permits the Commissioner to seek a court order liquidating a hopelessly insolvent insurer. Section 1019 provides: "Upon the issuance of an order of liquidation under section 1016, the rights and liabilities of any such person and of creditors, policyholders, shareholders and members, and all other persons interested in its assets, including the State of California, shall, unless otherwise directed by the court, be fixed as of the date of the entry of the order in the office of the clerk of the county wherein the application was made." Section 1021,

subdivision (a) states: "Upon the making of an order to liquidate the business of such person, the commissioner shall publish notice to its policyholders, creditors, shareholders, and all other persons interested in its assets. The order and the notice shall require claimants to file their claims with the commissioner, together with proper proofs thereof, within six months to one year, at the commissioner's discretion, after the date of first publication of such notice, in the manner specified in this article."

Sections 922.2 and 1025 balance reinsurers' interest in not being forced to pay a claim until liability and the amount of the claim are determined with an insolvent insurer's policyholders' interest in being compensated for a covered loss. Section 1025 prohibits claimants with potential future IBNR claims from sharing in distribution from an insolvent insurer's estate until liability for and the amount of the claims become certain: "*Claims founded upon unliquidated or undetermined demands* must be filed within the time limit provided in this article for the filing of claims, *but claims founded upon such demands shall not share in any distribution to creditors of a person proceeded against under section 1016 until such claims have been definitely determined, proved and allowed.* Thereafter, such claims shall share ratably with other claims of the same class in all subsequent distributions. [¶] *An unliquidated or undetermined claim or demand within the meaning of this article shall be deemed to be any such claim or demand upon which a right of action has accrued at the date of the order of liquidation and upon which the liability has not been determined or the amount thereof liquidated.*" (Italics added.)

Section 922.2 requires reinsurance contracts to contain an insolvency clause that the reinsurer's payment obligation for definite claims remains even if the reinsured company is insolvent and thus cannot pay its insured's claim: "No such deductions specified in Sections 922.1 and 922.15 shall be made or allowed unless the contract of reinsurance contains provision in substance as follows: [¶] The portion of any risk or obligation assumed by the reinsurer, when such portion is ascertained, shall be payable on demand of the ceding insurer at the same time as the ceding insurer shall pay its net retained portion of such risk or obligation, with reasonable provision for verification before payment, and the reinsurance shall be payable by the reinsurer, on the basis of the liability of the ceding insurer under the contract or contracts reinsured without diminution because of the insolvency of the ceding insurer. In the event of insolvency and the appointment of a conservator, liquidator or statutory successor of the ceding company, such portion shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis

of claims allowed against the insolvent company by any court of competent jurisdiction or by any conservator, liquidator, or statutory successor of the company having authority to allow such claims, without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claims. . . . [¶] The reinsurance agreements may provide that the conservator, liquidator or statutory successor of a ceding insurer shall give written notice of the pendency of a claim against the ceding insurer indicating the policy or bond reinsured, within a reasonable time after such claim is filed and the reinsurer may interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses which it may deem available to the ceding company or its conservator, liquidator or statutory successor. The expense thus incurred by the reinsurer shall be payable subject to court approval out of the estate of the insolvent ceding insurer as part of the expense of conservation or liquidation to the extent of a proportionate share of the benefit which may accrue to the ceding insurer in conservation or liquidation, solely as a result of the defense undertaken by the reinsurer. [¶] The original insured or policyholder shall not have any rights against the reinsurer which are not specifically set forth in the contract of reinsurance, or in a specific agreement between the reinsurer and the original insured or policyholder."

## The Mission Insolvency Plan and the Challenged Order

In 1985, the Commissioner placed Mission into section 1011 conservation. In 1987, the trial court authorized Mission's liquidation and appointed the Commissioner Mission's liquidator. The trial court established September 12, 1987, as the date by which all claims against Mission had to be filed or lost. Following that date, the Commissioner continued to marshal Mission's assets, prosecute actions on its behalf, and assess its liabilities. By September 30, 1994, the Commissioner had marshalled over $1 billion into the estate through settlements and litigation. The Commissioner had approved approximately $358 million in policyholder claims. Outstanding claims total over $2.8 billion. During the hearings on the final plan, the Commissioner stated over 80,000 undetermined, unliquidated, and unadjudicated claims existed.

On December 28, 1994, the Commissioner filed a proposed final liquidation plan for Mission. Under the proposal, the Commissioner would determine Mission's assets and liabilities, and then pay each approved claimant its pro rata share of Mission's assets. Part of the assets available for distribution will come from Mission's reinsurers, who, pursuant to their

contracts and section 922.2, will have to pay definite reinsurance claims, as determined by the Commissioner, into Mission's estate. The appellants filed objections. After extensive hearings, the trial court approved the modified final plan on July 13, 1995.

Under the plan, only claims filed by the September 1987 bar date were eligible for payment. Where such timely filed claims were contingent, unliquidated, or undetermined, claimants were given until August 18, 1995, to file amended claims showing that the claim had been made definite as to liability and amount. Such amended, now definite claims would participate in the plan. The appellants do not challenge this aspect of the plan.

However, the plan also permits the Commissioner to allow an IBNR claim against the reinsurers if he determines the uncertainty as to liability can be removed within 12 months of August 18, 1995. Moreover, other plan provisions permit the Commissioner to allow even claims not made certain as to liability within the 12-month period.

The plan also permits the Commissioner to make IBNR claims not certain as to amount on August 18, 1995, certain, and require Mission's reinsurers to pay those amounts into the estate, by using standard actuarial principles to calculate their present value.

The plan does not require the Commissioner to give notice to reinsurers that he is considering approving a claim for which they may have a reinsurance obligation. The plan states it is without prejudice to reinsurers' section 922.2 rights, but also states it does not prejudice any position the Commissioner may take. The Commissioner maintains that previous notices are adequate and that he is not obligated to send further section 922.2 notices. Appellants contend these aspects of the plan violate sections 1025 and 922.2.[2]

## DISCUSSION

■ The parties agree "[t]he Commissioner is an officer of the state [citation] who, when he or she is a conservator, exercises the state's police power to carry forward the public interest and to protect policyholders and

[2]Appellants also challenge the plan on a variety of other grounds, claiming that various portions of it are vague, ignore the orders of the Illinois courts supervising Centaur's liquidation, and give the Commissioner excessive discretion. Because we find the plan violates section 1025, and will have to be revisited in the trial court, we need not, and do not, decide the issue of compliance with section 922.2's notice provisions or address these additional challenges, which may become moot under a new and different plan.

creditors of the insolvent insurer. [Citation.] . . . [¶] In exercising this power, the Commissioner is vested with broad discretion. [Citation.]" (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 356 [38 Cal.Rptr.2d 453].) "[T]he actions of the Commissioner are subject to judicial review. . . . [T]his review is not de novo. The trial court reviews the Commissioner's actions under the abuse of discretion standard [citation]: was the action arbitrary, i.e, unsupported by a rational basis, *or is it contrary to specific statute,* a breach of the fiduciary duty of the conservator as trustee, or improperly discriminatory? [¶] We also test the action of the trial court by the abuse of discretion standard. [Citation.] In this connection we employ the equivalent of the substantial evidence test by accepting the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences. [Citation.]" (*Id.* at p. 358, italics added.)

■ However, "[a]n administrative determination will be interfered with by the courts where the determination is based upon an error in law. [Citation.] It is for the courts, not for administrative agencies, to lay down the governing principles of law. Accordingly, questions of law are reviewable. [Citation.] Whether an administrative agency applies the legislative standards validly set up, and whether it acts within the authority conferred or goes beyond it, are proper questions for judicial decision. [Citation.] The matter of statutory construction is not finally entrusted to administrative agencies; it is determined ultimately by the courts. [Citation.]" (*People* ex rel. *Fund American Companies* v. *California Ins. Co.* (1974) 43 Cal.App.3d 423, 431 [117 Cal.Rptr. 623].)

Thus, in interpreting the meaning and applicability of sections 1025 and 922.2, we conduct de novo review. " 'Interpretation and applicability of a statute or ordinance is clearly a question of law.' [Citation.] It is the duty of an appellate court to make the final determination from the undisputed facts and the applicable principles of law. [Citation.]" (*Sutco Construction Co.* v. *Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].) In conducting that review, "[w]here the statute is clear, the 'plain meaning' rule applies. The Legislature is presumed to have meant what it said, and the plain meaning of the language governs. [Citation.] When the plain meaning of a statute is not clear, a court may employ one or more canons of statutory interpretation to aid in ascertaining the meaning intended by the Legislature." (*Ibid.*)

■ Appellants argue section 1025, on its face, prohibits payments of contingent claims until the reinsurer's liability is determined, and unliquidated claims until their amounts are determined. We agree the statute can

have no plainer facial meaning. Section 1025 expressly forbids claimants with contingent or unliquidated claims from participating in a liquidation plan.

The Commissioner argues his generally broad discretion permits him to adopt a plan which better protects the rights of potential claimants to receive some compensation soon, rather than delay compensation into the future, when the reinsurers themselves might be insolvent, thus reducing the amount available to Mission's creditors. He also argues that adhering to section 1025's literal language would greatly increase the administrative cost of liquidating Mission, thus reducing the amount of money available for distribution to claimants. In essence, the Commissioner argues that section 1025 somehow permits him to estimate the likelihood of contingent claims becoming sure as to liability, and unliquidated claims becoming sure as to amount, based on standard actuarial principles, and compel the reinsurers to pay those estimated amounts now to permit Mission's final liquidation. He concludes his broad discretion requires him only to choose a reasonable, not the best, plan, and even were we to agree with appellants that a different plan was better, we should uphold his current plan.

While the Commissioner's policy and economic arguments may be persuasive, they cannot trump section 1025's express language. The Commissioner notes that actuarial estimates are used to assess the value of future liabilities, and are relied on in the insurance industry to set reserves and estimate future losses. The point of section 1025, however, is to preclude *present payment* of such contingent and unliquidated claims. The statutory scheme requires several steps. Even unliquidated and contingent claims must be filed before a court-set date. Claims not so filed are forever barred. Then, the claims must be made certain and liquidated before they can be paid. If the Commissioner chooses to liquidate an insolvent company quickly, some claimants who cannot make their claims certain and liquidated will lose their chance to participate. To avoid this result, the Commissioner could delay liquidation, continue to manage the insolvent company's assets, and give claimants more time to make their claims certain. Section 1025 simply precludes him from doing both. Thus, the plan is "contrary to specific statute" and must be modified to comply. (*In re Executive Life Ins. Co.*, *supra*, 32 Cal.App.4th at p. 358.)

The only relevant authority cited by the Commissioner, *Garamendi v. Mission Ins. Co.* (1993) 15 Cal.App.4th 1277 [19 Cal.Rptr.2d 190], does not support his argument that he can make claims certain by estimation based on actuarial principles. That case merely upheld the right of a claimant to file a

contingent and unliquidated claim, as permitted by section 1025. (15 Cal.App.4th at pp. 1284-1287.) It does not stand for the proposition that reinsurers can be forced to pay such claims based on actuarial estimates.

Although we agree with appellants that the plan violates the express language of section 1025, we note the Legislature failed to enact an amendment to section 1025 which would have expressly permitted a procedure similar to that contained in the Mission plan. While the parties dispute the significance of this failure, and we do not rely on it, we note it supports our view that the Commissioner's arguments should more properly be addressed to the Legislature, which is empowered to change section 1025 should it choose to do so.

## DISPOSITION

We reverse the trial court's order upholding the plan, and remand the matter with instructions that the trial court order the Commissioner to submit a new plan complying with section 1025. Appellants are entitled to their costs.

Spencer, P. J., and Masterson, J., concurred.