**FIRST AMERICAN INSURANCE COMPANY, Appellant,**

**Certain Underwriters at Lloyd's, London and London Market Companies, Plaintiffs,**

v.

**COMMONWEALTH GENERAL INSURANCE COMPANY and Certain Underwriters and Underwriting Syndicates Subscribing to Policy Nos. PXC–00892 and PXC–00893, Respondents.**

**No. WD 52627.**

Missouri Court of Appeals, Western District.

Aug. 26, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 30, 1997.

Application to Transfer Denied Nov. 25, 1997.

Mark Andrew Thornhill, Kansas City, for appellant.

Bruce Edward Baty, Kansas City, for respondents.

HANNA, Judge.

This is an appeal from the trial court's grant of summary judgment in favor of the Director of the Missouri Department of Insurance, Acting as Receiver for Commonwealth General Insurance Company (Receiver). The controversy centers on the competing claims of the Receiver and First American Insurance Company (First American) for reinsurance proceeds. The appellant, First American, filed an action for declaratory relief naming as defendants "Certain Underwriters and Underwriting Syndicates Subscribing to Policy Nos. PXC–00892 and PXC–00893," which de-

scribe the two reinsurance treaties. "Certain Underwriters at Lloyd's London and London Market Companies", the reinsurer, was faced with conflicting claims and filed an interpleader action against First American and the Receiver. Because both the declaratory judgment and interpleader actions arose out of the same reinsurance policies, they were consolidated by the circuit court. In granting summary judgment in favor of the Receiver, the trial court held that the reinsurance proceeds due from the reinsurers constituted assets of the Commonwealth General Insurance Company (Commonwealth) estate. We hold that because the cover notes created a separate contract between the reinsurers and First American, which remained solvent and legally obligated to resolve the Hickson lawsuit, the reinsurance proceeds were due to First American.

The underlying facts are not disputed. Only the law and its interpretation is at issue. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

Commonwealth is a Missouri insurer in liquidation, presently under the jurisdiction of the director of the Missouri Department of Insurance. Joe E. Williams, d/b/a Williams Trucking Service is a Georgia-based trucking company which operates throughout the south, including Texas. Commonwealth wrote insurance for Williams Trucking. Commonwealth was not licensed, however, to write in Texas. First American, a Missouri insurance company, is an insurer of motor carrier liability authorized to issue policies of insurance in, among other states, Texas. Accordingly, Commonwealth entered into an agreement with First American, which was licensed to write insurance business in Texas.

Pursuant to this agreement, First American filed a certificate of insurance, referred to as a Form E filing, with the Texas Railroad Commission on May 10, 1993 stating that First American had "issued to [Williams Trucking] a policy or policies of insurance effective from 11/19/92...."[1] This "fronting

agreement" is not an uncommon insurance industry practice. Commonwealth paid First American $100 for every certificate of insurance it filed. Also, Commonwealth agreed to indemnify First American for any loss resulting from its issuance of the certificate of insurance. Subsequently, in accordance with their agreement, First American was added as a named insured under each of the two reinsurance treaties.

■ Commonwealth reinsured much of the business it wrote. If an insurer desires to distribute a part of the risk it underwrites on its insurance policies, it may "cede" a portion of the risk to another underwriter, a reinsurer. *Christiania General Ins. Corp. of New York v. Great Am. Ins. Co.,* 979 F.2d 268, 271 (2d Cir.1992). When the "ceding insurer" transfers a portion of the risk for a group of underlying insurance policies, it is described as "treaty reinsurance." *Matter of Midland Ins. Co.,* 79 N.Y.2d 253, 582 N.Y.S.2d 58, 590 N.E.2d 1186 (1992). With respect to the commercial auto policy out of which the Williams' claim arose, Commonwealth had ceded a portion of the risk, through its intermediary, to the Reinsurers, the underwriting syndicates mentioned above. The two reinsurance treaties named in the trial court below are described as follows:

· First Excess Cession Reinsurance Agreement No. PXC–00892. This agreement provided reinsurance of $150,000 in excess of Commonwealth's retention of $50,-000 per occurrence (later amended to $125,000 in excess of $75,000 retention), with a maximum annual aggregate liability to the reinsurers of 250% (later increased to 275%) of gross ceded premium.

· Second Excess Cession Reinsurance Agreement No. PXC–00893. This agreement provided reinsurance of $80,000 in excess of $200,000 per occurrence with a maximum annual aggregate liability to the reinsurers of 250% (later increased to

---

1. A Form E certificate of insurance is a standard form commonly submitted to state regulatory agencies to certify insurance coverage. This form is determined by the National Association of Regulatory Utility Commissioners and promul-

gated by the Interstate Commerce Commission pursuant to the provisions of § 202(b)(2) of the Interstate Commerce Act (49 U.S.C.App. § 302(b)(2)). (Now, 49 U.S.C.A. § 14504(West 1996)).

300%) of gross ceded premium.[2]

On March 5, 1993, "cover notes" were issued by the Reinsurers. These cover notes were issued in accordance with First American's agreement with Commonwealth. Among other amendments, they named First American as an additional reinsured, effective as of July 1, 1992. Both reinsurance agreements provide that they "shall not be amended or modified without the written consent of the party against whom enforcement of the amendment or modification is sought...."

## The Underlying Action

On August 17, 1993, one of Williams' trucks collided with a vehicle driven by Jimmy Hickson in Houston, Texas. Hickson and his wife filed suit in the Texas state court against Williams Trucking. Commonwealth defended Williams Trucking pursuant to its policy of insurance. On September 1, 1995, as a result of Director Angoff's petition in the Jackson County Circuit Court, the court declared Commonwealth insolvent. Commonwealth was placed in receivership, and Mr. Angoff was appointed receiver. In compliance with the trial court's order, the Receiver terminated Commonwealth's defense of Williams in the Hickson lawsuit (and every other action). The Receiver then transmitted the Commonwealth claim files to the appropriate insurance guaranty associations, existing in the various states, which assumed the defense. *See, e.g.,* §§ 375.771, *et seq.* RSMo 1994. Proof of claim forms were sent to the Hicksons, Williams Trucking and, because of its agreement with Commonwealth, First American. In the present case, the Georgia Guaranty Association returned the Williams Trucking claim file to the Receiver after it learned that First American had filed certificates of insurance on behalf of Commonwealth. The Receiver, in turn, forwarded Williams Trucking's claim file to First American for handling according to its obligations under the certificate of insurance it had filed with the State of Texas. On December 12, 1995, First American negotiated a settlement of the Hickson claim, for the policy limits of one million dollars, the money in question here.[3]

First American had previously notified the reinsurance underwriters that it claimed the right to all reinsurance proceeds pursuant to its reinsurance contracts. When the Receiver learned of the claim asserted by First American, it notified the reinsurers on October 30, 1995, that payment under the reinsurance agreements should be made to the Receiver only. The reinsurers filed their interpleader action on December 6, 1995. On December 20, 1995, First American filed its declaratory judgment action. The lawsuits were consolidated, and the court ruled on the cross-motions for summary judgment. The trial court held that on the date Commonwealth was declared insolvent, the reinsurance proceeds due as a result of the Williams' claim became an asset of the Commonwealth estate, which the Receiver was obligated to collect. The trial court further held that the underlying agreement upon which First American based its claim to the reinsurer's proceeds—Commonwealth's agreement to add First American to the reinsurance agreements—was ineffective against the Receiver either because it could possibly diminish or defeat the Receiver's interest in the estate's asset or because the Receiver was otherwise empowered by the Missouri insurance statutes to disaffirm that agreement.

The central issue on appeal is whether the circuit court's declaration of Commonwealth's insolvency in September of 1995, triggered the insolvency clauses in the reinsurance

---

**2.** Under the terms of the two reinsurance treaties, the recipient of the proceeds would be entitled to $876,250 of the $1 million payment made by First American. Eight-hundred-seventy-six thousand, two-hundred and fifty dollars is the amount of money at issue in this lawsuit.

**3.** Significant dates and events in chronological order are as follows:

November 19, 1992 - Inception date of Commonwealth's policy on Williams Trucking

March 5, 1993 - First American becomes a named reinsured per Cover Notes issued by Reinsurers

May 10, 1993 - Certificate of insurance filed with Texas

August 17, 1993 - Vehicular accident between Williams and Hickson

September 1, 1995 - Jackson County Court places Commonwealth in receivership

December 12, 1995 - First American settles Hickson's claim

treaties, thereby altering the reinsurance company's obligation. The Receiver argues that at the time Commonwealth was declared insolvent, the reinsurance proceeds became assets of the Receiver's estate because what was originally a contract of indemnity was transformed into a contract of liability. This event established a fixed obligation of the reinsurer to pay the proceeds to Commonwealth's Receiver. The Receiver's argument continues that once the reinsurance proceeds became part of the Commonwealth estate, no subsequent action by First American (the settlement of the Hickson's lawsuit) could diminish or defeat the Director's right to that asset. *See,* § 375.1175.3, RSMo (1994).

The insolvency clause in the reinsurance agreements provides, in pertinent part:

> In the event of the insolvency of the Company, reinsurance under this Agreement shall be payable by the Reinsurer (on the basis of the liability of the Company under contract or contracts reinsured without diminution because of the insolvency of the Company) to the Company or to its liquidator, receiver, or statutory successor, except as provided by the controlling state law.[4]

■ Ordinary contracts of reinsurance operate solely between the reinsurer and the reinsured and are one of indemnity against loss. *O'Hare v. Pursell,* 329 S.W.2d 614, 620 (Mo.1959). Absent the insolvency language in the reinsurance policy, they are generally contracts between the reinsured and the reinsurer with no privity between the original insured and the reinsurer. *First Nat'l Bank of Kansas City v. Higgins,* 357 S.W.2d 139, 142 (Mo.1962) quoting *O'Hare,* 329 S.W.2d at 620. A reinsurer is not obligated to pay the receiver of the insolvent insured until it actually pays its policyholder for the claim. *See, Fidelity & Deposit Co. of Md. v. Pink,* 302 U.S. 224, 227–30, 58 S.Ct. 162, 163–64, 82 L.Ed. 213 (1937). The Supreme Court determined that reinsurance was a contract of indemnity, which created a windfall for reinsurers in those cases where the reinsured

was declared insolvent, since the reinsurer made payments only to the extent of the reinsured's payments. The protection afforded by reinsurance was defeated by the insolvency of the primary insurer. *Bluewater Ins. Ltd., by Tennessee Ins. Co. v. Balzano, by Colaiannia,* 823 P.2d 1365, 1371 (Colo. 1992). However, as a result of the anomaly created by *Pink,* many jurisdictions, including Missouri, enacted statutes that, for all practical purposes, ensured that every reinsurance agreement included an insolvency clause. *See,* § 375.246.5, RSMo (1994); *Ainsworth v. General Reinsurance Corp.,* 751 F.2d 962, 964–965 (8th Cir.1985).

■ Generally, when a reinsured becomes insolvent, the proceeds of the reinsurance are assets of the Receiver's estate to be distributed among the creditors. *Bluewater Ins. Ltd.,* 823 P.2d at 1371; *Quackenbush v. Mission Ins. Co.,* 46 Cal.App.4th 458, 54 Cal. Rptr.2d 112, 114 (1996); *Matter of Midland Ins. Co.,* 79 N.Y.2d 253, 582 N.Y.S.2d 58, 61, 590 N.E.2d 1186, 1189 (1992). Missouri law is clear that when a reinsured becomes insolvent, the insolvency clause operates to require the reinsurer to pay the full amount due under the reinsurance agreement for the underlying claim to the reinsured's receiver, who then uses the reinsurance proceeds and other assets to pay claims of all creditors. *First Nat'l Bank of Kansas City v. Higgins,* 357 S.W.2d 139, 143 (Mo.1962); *Homan v. Employers Reinsurance Corp.,* 345 Mo. 650, 136 S.W.2d 289, 296 (1939). It is commonly understood that reinsurance proceeds constitute a substantial part of the insolvent insurance company's estate.

## Certificate of Insurance/Form E filing

In order for Williams Trucking and Commonwealth to satisfy the requirements of the Interstate Commerce Commission and the State of Texas, it was necessary to show evidence of financial responsibility for payment of accident claims. *Steere Tank Lines, Inc. v. U.S.,* 577 F.2d 279 (5th Cir., 1978),

---

4. This provision is inserted in the reinsurance agreements in response to § 375.246, RSMo 1994, which requires that reinsurance not be treated as an asset or deduction from liability of an insurance company unless the reinsurance is

payable "without diminution because of the insolvency of the ceding company." *See, Ainsworth v. General Reinsurance Corp.,* 751 F.2d 962, 964 (8th Cir.1985).

*cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 634 (1979). The Form E certificate of insurance, which was filed by First American with the State of Texas, certified that First American had issued to Williams Trucking a policy of insurance effective 11/19/92.

A certificate of insurance was characterized in *Insurance Co. of North America v. B & E Trucking, Inc.,* 665 F.Supp. 764 (W.D.Mo.1987) as a promise on behalf of the insurer that a policy of insurance "is in effect," *id.* at 768–69, and is consistent with the state's regulatory purpose of assuring that motor carriers will be permitted to operate in that state only if they are insured. *Id.* at 768. The filing of a certificate of insurance is designed to protect the public as well as the insured.

**Cover Notes**

Here, the two cover notes were related to the two reinsurance treaties that previously had been issued. Each cover note stated:

> This Cover Note is intended for use as evidence that reinsurance as described above has been effected. Immediate advice must be given if there are any discrepancies, inaccuracies, or necessary changes.

The two cover notes, one for each of the treaties of reinsurance, were issued March 5, 1993, and have an effective date commencing "July 1, 1992 anniversary of a continuous Agreement incepting April 15, 1991" and could be terminated any July 1 with 90 days' prior notice. To the extent the cover notes conflicted with the two original treaties, they superseded the treaties in effect before First American was added as an additional reinsured.[5] They determined First American's status as a named reinsured.

The record in the trial court reveals James Baskin, president of Commonwealth, was the individual directly involved in the acquisition of treaties for the reinsurance of commercial automobile insurance underwritten by Commonwealth. He authorized Commonwealth's intermediary, G.L. Hodson & Sons, Inc., (now Willis Faber North American, Inc.) to negotiate the terms of reinsurance on behalf of Commonwealth. Hodson secured the original two treaties from the London market. Subsequently, in February 1993, Mr. Baskin directed Mr. Johnson, a senior broker at Hodson, to add First American as a named insured. This application was confirmed by letter and the delivery of the cover notes of March 1993 from Hodson. Baskin reviewed each of the cover notes and accepted them.

The cover notes, which are six pages in length, are different from and more comprehensive than the typical binder. They refer to an existing, written agreement between the parties, unlike a binder, which generally refers to a standard policy, issued by the company upon similar risks. They list the names of the companies reinsured, the terms of the agreement, the business reinsured, the territory covered, the respective losses covered, the original limits of liability, the ceded premiums and reports, profit contingencies to include income and outgo, reserves, and general conditions.

The Receiver contends that First American has a threshold obligation to establish itself as an additional reinsured, which it failed to meet because Baskin's oral agreement to add First American as an additional reinsured does not satisfy the written consent requirement in Section XXIV of the treaties. Section XXIV provides that "this Agreement shall not be amended or modified without the written consent of the party against whom enforcement of the amendment or modification is sought."

The Receiver refers to Mr. Baskin's affidavit, which states that he "expressly directed ... a broker with Willis Faver that First American be added as a named insured under the Reinsurance Treaties." The Receiver's reference to Baskin's instruction (the affidavit does not state whether the direction was oral or written) is not determinative because the cover notes constitute Commonwealth's written consent.

---

**5.** There were changes other than naming First American as an reinsured. The premium on the Excess of Loss and the rate were changed, and there was a change in the retention on the First Excess Cession.

■ Normally, an application for insurance is an offer by applicant for a contract of insurance. However, if the reinsurer proposes changes in the coverage terms that vary from the application, the policy maybe deemed a counter offer. *Kopff v. Economy Radiator Service,* 838 S.W.2d 449 (Mo.App. 1992). To the extent that the cover notes may have modified some parts of the original agreements,[6] delivery of the cover notes became a counter offer. Commonwealth received the cover notes with the understanding that "[I]mmediate advice must be given if there are any discrepancies, inaccuracies or necessary changes." Thus, acceptance was conditioned upon the review of the cover notes for discrepancies, which was the mode in which the cover notes were to be accepted. *L.B. v. State Comm. of Psychologists,* 912 S.W.2d 611, (Mo.App.1995); *Cal Caulfield and Co., Inc. v. City of Belton,* 687 S.W.2d 207 (Mo.App.1984). They were reviewed by Baskin and accepted. The law will deem an acceptance if the policies are kept for a reasonable length of time. *Community Title Co. v. Safeco Ins. Co. of America,* 795 S.W.2d 453 (Mo.App.1990). The cover notes were accepted by their delivery to Commonwealth, Baskin's review and acceptance. They constitute written consent by Commonwealth to the addition of First American as a reinsured.[7]

Next, we address the primary contention in this lawsuit. First American maintains that it is a named insured under the two reinsurance policies, and therefore, the Reinsurer's obligation runs directly to it. It admits that it had a legal duty to resolve the underlying claim and argues that since it was a solvent insurer, the reinsurance agreements were indemnity contracts, payable upon settlement of the underlying lawsuit, and were not converted to agreements of indemnity against loss upon the court's declaration of insolvency. The Receiver responds

that at the moment of the court's declaration of Commonwealth's insolvency, the relationship of the parties became fixed and the reinsurance proceeds were due Commonwealth's estate. The Receiver does not take issue with the validity of the claim by Williams Trucking, nor does it suggest that First American should not have paid it. In fact, the Receiver tendered the Williams Trucking claim to First American with the advice, that it was the "primary provider" of insurance coverage and must "accept responsibility for adjudication and settlement." Commonwealth did not sustain a loss, nor is there an argument here that the Receiver will suffer a loss because of the Williams Trucking claim. Critical to the Receiver's position is whether subsequent events, here the payment and settlement of the lawsuit, altered that relationship. If so, the proceeds are assets of Commonwealth's estate.

■ An insurance policy is simply a contract, involving matters of basic contract law. *Frisella v. Reserve Life Ins. Co. of Dallas,* 583 S.W.2d 728, 733 (Mo.App.1979). Any claim or suit by either party must be based on the policy issued. *Bartleman v. Humphrey,* 441 S.W.2d 335, 342 (Mo.1969). Reinsurance agreements are subject to the general law of contracts. *General American Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 130 (Mo.App.1993). Insurance contracts must be construed to give effect to the parties' intent. *Id.* at 132. Also, like other contracts, a reinsurance agreement's insolvency clause is construed to give effect to the parties intent. *Great Atlantic Life Ins. Co. v. Harris,* 723 S.W.2d 329, 333 (Tex.App.1987).

The parties intended to afford First American needed protection with an indemnity agreement from Commonwealth and protection through reinsurance. To accomplish their intent, Commonwealth directed its bro-

---

**6.** It may be inferred from the record that Baskin requested only that First American be added as an additional reinsured but that the cover notes included other slight changes to the original treaties. The determination that the cover notes amounted to written consent remains the same whether we consider Baskins' direction or the delivery of the Cover Notes, with acceptance conditioned upon their review, an offer.

**7.** The Receiver argues that they were not signed. Of course, the agreement quoted does not require a signature. Also, a signature is not always essential to the binding force of an agreement, and whether an unsigned writing constitutes a binding contract depends on the parties' intention. *Stege v. Hoffman,* 822 S.W.2d 517 (Mo. App.1991).

ker to add First American as an additional reinsured under the treaty agreements. As noted, a purpose of the cover notes was to show that reinsurance had been established in favor of First American. There is nothing in the record to suggest that the parties did not intend for First American to bear the risk. Rather, the record of the events leading up to the filing of the certificate of insurance, and First American's request for indemnification, confirm that the filing of the certificate of insurance was more than a mere legal formality.

First American's certificate of insurance created a legal obligation that bound it to Williams Trucking according to the terms and conditions of Commonwealth's insurance policy. *Insurance Co. of North America v. B & E Trucking*, 665 F.Supp. 764, 768–69 (W.D.Mo.1987). First American acknowledged this duty and to that end, it paid policy limits in the settlement of the claim. In turn, it made a claim against the reinsurers.

A cover note is a written document given to the insured, which represents that the broker has procured insurance as specified for the insurers named. *Lowitt v. Pearsall Chemical Corp. of Md.*, 242 Md. 245, 219 A.2d 67 (1966). It is similar to a "binder" or a certificate representing that insurance has been procured. *Id.* Although it is commonly compared to a binder, a cover note generally is used when insurance is placed with foreign companies. *See,* 12A J.A. & J. Appleman, *Appleman, Insurance Law & Practice*, (1981) § 7227 at 147 n. 1.[8] A binder's purpose is to bind the reinsurer in case a loss occurs pending the actual issuance of the policy. *Shelter Mut. Ins. Co. v. Flint*, 837 S.W.2d 524 (Mo.App.1992). Thus, First American was a named reinsured under the terms of the original treaties of reinsurance and as such was afforded the indemnification protection of the risk it incurred pursuant to its certificate of insurance filing. *Christia-*

*nia General v. Great Am. Ins. Co.*, 979 F.2d at 271.

The legal effect and purpose of the insolvency clause is well stated in the cases cited by the Receiver. *Quackenbush v. Mission Ins. Co.*, 46 Cal.App.4th 458, 54 Cal.Rptr.2d 112, 113–15 (1996); *Matter of Midland Ins. Co.*, 79 N.Y.2d 253, 582 N.Y.S.2d 58, 60–61, 590 N.E.2d 1186, 1188–89 (1992). They hold that the receiver of the insolvent reinsured is entitled to the reinsurance proceeds. The insolvency clause requires the reinsurer to pay its proceeds due under the reinsurance agreement to the receiver when a single reinsured is declared insolvent. The proceeds are paid into the insolvent's estate to pay general administration costs and claims of the creditors. The insolvency clause is designed to ensure that the reinsurer does not gain a windfall by avoiding payment under a contract of indemnification against loss, which is not payable until the reinsured sustains a loss. *Ainsworth v. General Reinsurance Corp.* 751 F.2d 962, 965 (8th Cir.1985). However, a decisive distinction between the facts in the cases cited by the Receiver and the one at hand is that none of the Receiver's cases had a solvent reinsured remaining after the declaration insolvency. The Receiver's positions suggests that the insolvency clause should eliminate a reinsurer's contractual duty to another of its named reinsureds.

In determining the effect of an insolvency clause, a court must consider the purpose of the clause, the context in which it appears in the policy, and the purpose of the reinsurance. *First Nat'l Bank of Kansas City v. Higgins*, 357 S.W.2d 139, 146–47 (Mo. banc 1962). In *Higgins*, our Supreme Court held that the reinsurance proceeds were not general assets of the receivership estate. *Id.* at 146–47. After the *Higgins* court determined that the wording of the reinsurance contract was an indemnification against lia-

---

8. "Binder" has a commonly accepted meaning in the insurance industry. It is a contract which is temporary in nature and insures the property pursuant to the standard terms of the policy, must be supported by consideration, and remains temporary until the formal contract is issued. 43 Am.Jur.2d § 219, p. 304. *Great Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 481 F.2d 948, 951, n. 6 (2d Cir.1973). A binder does not include all of the terms of the policy. *Pape v. Mid–America Preferred Ins. Co.*, 738 S.W.2d 882 (Mo.App. 1987). It generally will state only the subject matter, the risk insured against, the duration of the binder, the amount of the coverage, and the amount of the premium. *Hay v. Utica Mut. Ins. Co.*, 551 S.W.2d 954, 955 (Mo.App.1977).

bility, it held that the insolvency clause was "... for the purpose of providing a procedure of payment to the claimants in order to guarantee the integrity of the policies; not to assure payments to general creditors whose interest [the reinsurer] had no concern or reason to indemnify under the provisions of its reinsurance agreement." *Id.* at 147.

■ The reinsurance agreement included both Commonwealth and First American as named reinsureds, thus it created a separate contractual obligation flowing from the reinsurers to Commonwealth and to First American. Thus, the reinsurers owed a direct and separate obligation to each of its named insureds. *See, e.g., Zeiger v. Farmers' & Laborers' Co–op. Ins. Ass'n of Monroe County, Mo.*, 358 Mo. 353, 214 S.W.2d 426 (1948). In *Zeiger*, the court held that a mortgagee clause in a fire insurance contract created a separate and distinct contract for the benefit of the mortgagee. *Id.* 214 S.W.2d at 429. Also, in *Matland v. United Services Automobile Ass'n,* 174 N.J.Super. 499, 417 A.2d 46 (1980), a husband added his wife as a named insured, instead of purchasing a separate policy of insurance. The court held that this created a separate contractual obligation which was assumed by the insurer when it issued a policy naming her as an insured. *Id.* 417 A.2d at 52.

A proper construction of the insolvency clause would require the reinsurer to pay the insolvent reinsured's estate if the insolvent reinsured was entitled to the proceeds. The Texas Court in *Great Atlantic Life Ins. Co. v. Harris,* 723 S.W.2d 329, 333–334 (Tex.App. 1987) construed the insolvency clause, where there remained a solvent reinsured, against the receiver. The court declined to construe the insolvency provision to give the insolvent reinsured's receiver authority to collect funds to which the insolvent reinsured would not be entitled if it were not in receivership. *Id.* at 334.

■ While Commonwealth's insolvency would normally trigger the insolvency clause, in this case there was a solvent insurer who remained legally obligated to protect the interests of its insured and to defend the injured party's lawsuit. Thus, we conclude that a determination of insolvency did not change the terms of the reinsurance contract as applicable to the Hickson claim to one of liability, as the Receiver argues, because of First American's solvent status and its legal obligation as an insurer. These facts eliminated the Receiver's exposure and precluded the triggering of the insolvency clause.

■ The final issue addresses the application of §§ 375.1184.1, 375.1182.1 and 375.1184.4, RSMo 1994, as a basis for awarding the reinsurance proceeds to the Receiver. The Receiver contends that Baskin's oral agreement violates § 375.1184.4 because it was not in writing, not executed by Commonwealth, and not approved by the Board of Directors, or if approved, not reflected in the minutes of the Board. Therefore, it continues, Baskin's agreement to add First American as an additional named reinsured, diminishes or defeats the Receiver's interest in the reinsurance proceeds. Accordingly, the Receiver argues that § 375.1184.4 grants him a statutory right to disaffirm Baskin's agreement the result being that First American never became a part of the reinsurance treaties. Additionally, the Receiver states that § 375.1184.1 [9] grants him broad authority to disaffirm pre-liquidation agreements to which the insurer is a party if, in its sole discretion, it decides performance would be burdensome and repudiation will promote the orderly administration of the affairs of the insurer.

In response, First American contends that the statutes do not create title to assets in the Receiver in that they are applicable only to Commonwealth assets which it owned. Also, First American argues that its Declaratory Judgment action seeks performance of its contract of indemnification with the reinsurers, and is not an action against the Receiver (or Commonwealth).

---

9. Authority is also found in § 375.1182.1, RSMo 1994, which states: "(11) To enter into such contracts as are necessary to carry out the order to liquidate, and to affirm or disavow *any con-* *tracts* to which the insurer is a party;" (Emphasis added). The provisions are sufficiently similar that they are treated as the same for purposes of this decision.

As noted earlier, Baskin's "agreement," whether oral or written, is not an issue controlling the outcome of our decision. The cover notes, delivered and accepted by Commonwealth, constituted written consent. There are no side, alleged, or oral agreements, as they are characterized by the Receiver. We have not construed the reinsurance proceeds as assets of Commonwealth's estate.

We have held that the reinsurance proceeds were not assets of the Receiver and that Commonwealth is not a party to the agreement between the reinsurers and First American. We have determined that it is a separate contract and a separate obligation.

Section 375.1184.4 refers to "[a]n agreement which tends to diminish or defeat the interest of the liquidator *in any assets acquired by him* under section 375.1176...." (Emphasis added). Neither of these statutes authorizes a receiver to disaffirm or cancel obligations its insurer did not owe, nor to invalidate rights to which its insurer was not entitled. The Receiver ignores the separate, independent agreement between First American and the reinsurers under which the reinsurers owe a direct obligation to its other named reinsured. The Receiver, in his capacity of the liquidator of Commonwealth, acquired no greater rights under the reinsurance agreement, than its insolvent company had at the time the declaration of insolvency. *See, e.g., First Nat'l Bank of Kansas City v. Higgins,* 357 S.W.2d at 147. Nor can he defeat the separate, independent obligations running from the reinsurer to the reinsured. *See, Matland,* 417 A.2d at 52. Point denied.

The judgment of the trial court is reversed and the cause is remanded for entry of a judgment consistent with this opinion in favor of First American for the proceeds of the reinsurance policy due on the Hickson claim.

ULRICH, C.J., P.J., and ELLIS J., concur.