TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00404-CV






Philip W. Barnes, Appellant


v.


Old American Mutual Fire Insurance Company, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. D-1-GN-05-004402, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Philip W. Barnes appeals from the trial court's order granting the motion of
Old American Mutual Fire Insurance Company ("Old American") for directed verdict and awarding
Old American damages, prejudgment and postjudgment interest, and attorneys' fees in a dispute
arising from various nonstandard automobile insurance programs. We will affirm the trial court's
order awarding damages, prejudgment interest, and attorneys' fees and will reverse that portion of
the order awarding postjudgment interest on the arbitration-award amount of $899,652.85 and render
judgment that Old American recover no postjudgment interest on the arbitration-award amount.


FACTUAL AND PROCEDURAL BACKGROUND

 The nonstandard automobile insurance market provides insurance for motorists who
have poor credit histories, poor driving records, prior accidents, or other underwriting concerns that
make it difficult for those motorists to obtain insurance through the traditional market. In Texas, the
nonstandard insurance market is structured through a tripartite relationship among a county mutual
insurance company, a managing general agency ("MGA"), and one or more reinsurance companies. 
A county mutual insurance company ("county mutual") is an insurance carrier that is exempt from 
most state insurance laws. See Tex. Ins. Code Ann. § 912.002 (West 2009). The county mutual acts
as the insurance carrier and allows its policies to be issued by its agents. In exchange for allowing
policies to be issued pursuant to its authority to conduct the business of insurance, the county mutual
receives a "front fee," that is, a percentage of the premiums written in a particular program.

 From an operational standpoint, almost all the functions of administering a particular
insurance program are delegated by a county mutual to its appointed MGA. The MGA conducts the
majority of the business of the insurance program and is granted broad authority under the parties'
MGA agreement to act on behalf of the insurance carrier. Among other functions, the MGA accepts
insurance applications, underwrites applications, issues policies, collects premiums, pays
commissions to retail agents, and adjusts and pays claims. Often, all or part of the obligations the
MGA owes to the county mutual are supported by some form of guaranty agreement. Unlike the
county mutual's compensation that is set out in the MGA agreement, the MGA's compensation is
delineated in the reinsurance agreement between the county mutual and its reinsurer or reinsurers. 

 Reinsurance is a means whereby a company that issues an insurance policy can
allocate or "cede" all or a portion of the risk it bears on that policy to another insurance company in
return for a portion of the premium. Great Atl. Life Ins. Co. v. Harris, 723 S.W.2d 329, 330
(Tex. App.--Austin 1987, writ dism'd). Traditionally, 100 percent of the premiums written and
losses incurred under a nonstandard insurance program are accepted by one or more reinsurers. In
this context, the county mutual is referred to as the "reinsured" or the "ceding carrier." The
relationship between the ceding carrier and its reinsurers is governed by a reinsurance agreement.

 This case concerns the extent to which a guaranty agreement signed by Barnes applies
to various nonstandard automobile insurance programs. In 1993, Barnes formed the Heartland
Lloyds Insurance Company ("Heartland") and served as its president. In February 2002, Barnes
formed an MGA called Legacy Managing General Agency ("Legacy"). On April 30, 2002, Legacy
entered into an MGA agreement ("MGA Agreement") with Old American, and Heartland agreed,
effective May 1, 2002, to reinsure all the nonstandard automobile insurance business produced by
Legacy for Old American. In addition, Barnes, as president of Heartland, signed a guaranty of
performance of Legacy, effective May 1, 2002. On July 31, 2002, Barnes resigned as president
of Heartland, and on August 12, 2002, Heartland terminated its reinsurance agreement with
Old American, effective September 30, 2002. 

 On December 10, 2002, Old American signed a reinsurance agreement with Universal
Reinsurance Company ("Universal Re"). Article 5.1 of the agreement brought about a novation; that
is, Universal Re was substituted for Heartland, effective retroactively as of May 1, 2002. On
December 12, 2002, Barnes executed an "absolute and unconditional" personal guaranty of Legacy's
performance under the MGA Agreement with Old American ("Guaranty Agreement"), also effective
retroactively as of May 1, 2002. On December 24, 2002, Old American released Heartland
as reinsurer and guarantor of Legacy through an agreement and release, effective retroactively as
of May 1, 2002.

 During 2002 and 2003, Barnes took profit distributions from Legacy in the amount
of $228,663.21. Then, in 2004, he formed Austin Indemnity Lloyds Insurance Company
("Austin Indemnity"), another reinsurance company. Barnes suggested to Old American that Austin
Indemnity replace Universal Re as the reinsurer. He also proposed a commission adjustment
agreement ("Commission Adjustment Agreement") to modify commission amounts earned by
Legacy on all business produced for Old American. On September 2, 2004, Old American, Austin
Indemnity, and Universal Re executed a novation agreement that substituted Austin Indemnity for
Universal Re as the reinsurer of the Legacy program, effective retroactively as of May 1, 2002. 
Barnes now controlled both the producer (Legacy) and the reinsurer (Austin Indemnity) of the
Legacy book of business. On October 1, 2004, Old American and Legacy signed the Commission
Adjustment Agreement. If Legacy produced good business, that is, insurance business with a
favorable loss ratio, (1) Legacy's commission would increase. If Legacy produced "bad" business, its
commission rate would be adjusted downward.

 Shortly thereafter, Barnes's relationship with his partners at Legacy began to
deteriorate. On March 14, 2005, he resigned his management position with the company, although
he retained his 38-percent ownership interest in Legacy and continued to function as its
registered agent. On March 24, 2005, Austin Indemnity terminated its reinsurance agreement with
Old American regarding the Legacy business. On April 1, 2005, Dorinco Reinsurance Company
("Dorinco") and AXA Re ("AXA") agreed to equally reinsure the Legacy business ("Dorinco
agreement"). 

 On October 10, 2005, Old American made demand to Legacy for commission
adjustment amounts due under the Commission Adjustment Agreement, losses that Old American
calculated were $1,404,901.22 as of June 30, 2005. Legacy, however, failed to pay. On
November 1, 2005, Old American made demand to Barnes under the Guaranty Agreement for
payment of the Legacy commission adjustment amounts. When he failed to pay, Old American filed
suit on December 12, 2005, alleging that Barnes had breached the Guaranty Agreement. 

 Old American instituted an arbitration action against Austin Indemnity in
March 2006, alleging breach of the reinsurance agreement. Based on the Guaranty Agreement, the
arbitration panel found Barnes liable to Old American for the amount of $914,652.85. He
acknowledged liability, and that amount, reduced to $899,652.85 to reflect his one payment of
$15,000, was made part of the final judgment in this case. On March 31, 2006, Barnes bought out
the partners in Legacy, attaining 100-percent ownership interest in the company. The Dorinco and
AXA reinsurance agreement was terminated effective April 15, 2006. On December 6, 2006,
Old American made demand to Barnes as guarantor to pay the unpaid premium, fees, and taxes of
$638,588.66 under the Dorinco and AXA reinsurance agreement.

 After a jury trial in March 2007, the trial court granted Old American's motion for
directed verdict, determining as a matter of law that the Guaranty Agreement applied to all
transactions in question. Based on the jury verdict, the trial court also awarded Old American
attorneys' fees and postjudgment interest, plus prejudgment interest on the commission adjustment
and unpaid premium portions of the judgment. This appeal followed.


DISCUSSION

Standard of Review

 Construction of an unambiguous contract is a question of law. MCI Corp. v. Texas
Utils. Elec. Co., 995 S.W.2d 647, 650-51 (Tex. 1999). Neither Barnes nor Old American contended
the Guaranty Agreement was ambiguous, and the trial court construed it as a matter of law. The
standard of review in this case, therefore, is de novo. See id. at 651.


Guaranty Agreement


 In his first issue, Barnes argues the trial court erred when, as a matter of law, it
construed the Guaranty Agreement to apply to each successive reinsurance program. He contends
the scope of the Guaranty Agreement is limited to Legacy's obligations under the MGA Agreement
between Old American and Heartland. Old American, however, asserts that, in consideration of
Legacy's appointment as Old American's MGA under the MGA Agreement, Barnes absolutely and
unconditionally guaranteed the performance of any and all of Legacy's obligations under the
MGA Agreement and under any of its amendments.

 In pertinent part, the Guaranty Agreement reads as follows:

 2. Guarantor agrees to guarantee the performance of any
and all obligations of the [MGA] under the [MGA]
Agreement, including, without limitation, the payment
of all funds owed to [Old American] insureds, finance
companies, claimants, or agents by the [MGA] and all
[MGA's] balances arising pursuant to such [MGA]
agreement. This Guaranty expressly includes any
reasonable attorneys' fees and expenses incurred by
[Old American] by reason of the [MGA's] failure to
satisfy any such obligation.


 3. This Guaranty shall be absolute and unconditional.
[Old American] shall have the right in its sole
discretion to proceed against Guarantor for any
indebtedness within the scope of this Agreement
without first exhausting its remedies against the
[MGA].


 4. Guarantor hereby acknowledges the adequacy and
receipt of [Old American's] appointment of [Legacy]
as the [MGA] pursuant to the [MGA] Agreement, any
amendment to the [MGA] Agreement, and any
subsequent agency agreements entered into by the
parties herein as valuable consideration for this
Agreement. (Emphasis added.)



 By guaranteeing Legacy's performance in exchange for Old American's appointment
of Legacy as the MGA, pursuant to the MGA Agreement and any amendments and subsequent
alterations of its terms, Barnes provided a continuing guaranty. A continuing guaranty is defined
as follows:

 A continuing guaranty is one which is not limited to
a single transaction, but which contemplates a future
course of dealing, covering a series of transactions,
generally for an indefinite time or until revoked. It is
simply a divisible offer for a series of separate
unilateral contracts, and contemplates a series of
transactions between a debtor and a creditor, rather
than a single debt. A continuing guaranty is
prospective in its operation and is generally intended
to provide security with respect to future transactions
within certain limits, and contemplates a succession of
liabilities, for which, as they accrue, the guarantor
becomes liable.



38A C.J.S. Guaranty, § 8, 583 (2008). See also 38 Am.Jur.2d, Guaranty, § 20, 887-88 (1999)
(continuing guaranty can include subsequent indebtedness without new consideration being given).

 Barnes's guaranty applied not only to the instant contractual relationship between
Barnes and Old American but also to their future endeavors. His guaranty applied to "any and all"
of Legacy's obligations and "all [of Legacy's] balances" arising under the MGA Agreement, which
indicated the guaranty covered multiple transactions, with varying amounts due, at various times. 
The use of words or expressions guaranteeing "any and all" obligations or indebtedness indicates the
guaranty is a continuing one. 38A C.J.S. Guaranty, § 63, 661-62 (1996). No time limit or duration
is contained in either the Guaranty Agreement or the MGA Agreement, and there is no evidence that
Barnes ever attempted to terminate the Guaranty Agreement. The continuing nature of Barnes's
agreement implies his guaranty extended forward to cover all of Legacy's future obligations within
the scope of the MGA Agreement.

 Furthermore, only one MGA Agreement existed between Legacy and Old American.
Barnes executed the Guaranty Agreement when Universal Re was about to take over reinsurance of
Legacy's insurance business under a novation. Barnes not only knew about the novation, he helped
draft the documents to accomplish it. Barnes signed the Guaranty Agreement and, as a result of his
efforts, the MGA Agreement remained in effect for several years, with four different reinsurers. (2) 
The substitution of each new reinsurer simply worked an amendment of the MGA Agreement, which
continued in effect until it was terminated in April 2006. 

 Barnes also asserts that the Guaranty Agreement could not be read to include amounts
under the Commission Adjustment Agreement as that agreement was a separate agreement intended
to change the way the reinsurer Austin Indemnity paid commissions. That is, Barnes contends the
Commission Adjustment Agreement was not an amendment of the MGA Agreement and thus within
the scope of the guaranty. Contrary to Barnes's argument, however, we find that the Commission
Adjustment Agreement was an amendment of the MGA Agreement rather than an amendment of
the Austin Indemnity reinsurance agreement. Article 3.7 of the MGA Agreement states that the
commission may be amended upon mutual agreement of Old American and Legacy "without
otherwise affecting the terms and conditions of this Agreement." The first paragraph of the
Commission Adjustment Agreement declares that this adjustment of Legacy's commission applies
to commissions for policies underwritten by Old American "under the [MGA] Agreement." 
Furthermore, the Commission Adjustment Agreement is signed by representatives of Old American
and Legacy, not by representatives of Austin Indemnity. Because the commission adjustment
amounts owed by Legacy to Old American were obligations incurred by Legacy under the MGA
Agreement, they were covered by Barnes's guaranty under the Guaranty Agreement. Finding that
the scope of the Guaranty Agreement is not limited to Legacy's obligations under the MGA
Agreement between Old American and Heartland, we overrule Barnes's first issue.


Dorinco Reinsurance Agreement


 In his second issue, Barnes argues the trial court erred when it held that the Dorinco
reinsurance agreement was not a material alteration to the obligations underlying the Guaranty
Agreement. A material alteration of a contract between a creditor and principal debtor is one that
either actually injures or enhances the risk of injury to the guarantor. Austin Hardwoods, Inc.
v. Vanden Berghe, 917 S.W.2d 320, 326 (Tex. App.--El Paso 1995, writ denied); Federal Deposit
Ins. Corp. v. Attayi, 745 S.W.2d 939, 944 (Tex. App.--Houston [1st Dist.] 1988, no writ). See
United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360, 366 (Tex. 1968). Because a material
alteration is an affirmative defense, the burden is on the guarantor to prove that a material alteration
occurred. Frost Nat'l Bank v. Burge, 29 S.W.3d 580, 588 (Tex. App.--Houston [14th Dist.] 2000,
no pet.). The guarantor asserting the defense must demonstrate the following: (1) the existence of
a material alteration to the underlying contract; (2) made without the guarantor's consent; (3) that
is to the guarantor's detriment (that is, prejudicial to the guarantor's interest). Id. 

 Barnes maintains that the "unaffiliated reinsurance transaction" with Dorinco
constituted a material alteration to the prior reinsurance programs and was not a risk he originally
undertook. He contends the change in commission rates enhanced his risk of injury and had a
negative impact on Legacy's performance. He asserts that the 17-percent provisional commission
rate under the Dorinco agreement resulted in a cash-flow crisis at Legacy, led to improper
commission advances and, ultimately, caused a default on payments to Dorinco. Moreover, Barnes
contends that, not only did he not consent to the Dorinco transaction, he had resigned from Legacy
at the time and was neither part of the negotiations nor knew of its terms. He thus argues that,
because the Dorinco agreement prejudiced and harmed him, he was relieved of liability for the
Dorinco balances under the Guaranty Agreement.

 We find the trial court correctly held that Barnes's material-alteration defense failed
as a matter of law. In consideration of Old American's appointment of Legacy as the MGA under
the MGA Agreement and any of its subsequent amendments, Barnes gave his absolute,
unconditional, and continuing guaranty of all of Legacy's obligations under the MGA Agreement. 
The MGA Agreement allowed Legacy to issue policies, collect premiums and commissions, and
adjust and pay claims related to automobile insurance policies on Old American policy forms. These
activities are what the MGA Agreement governed in 2002 when Heartland and later Universal Re
were the reinsurers; what it governed in 2004 when Austin Indemnity was the reinsurer; and what
it governed in 2005 when Dorinco and AXA became the reinsurers. Although the Dorinco
agreement changed the identity of the reinsurers of the business produced by Legacy and modified
the provisional commission rate earned by Legacy, the essential characteristics of the MGA
Agreement remained the same under the Dorinco agreement. Therefore, rather than a material
alteration to the underlying contract, the Dorinco agreement was only an amendment to the MGA
Agreement. Barnes's second issue is overruled.


Guaranty Agreement Supported by Consideration


 In his third issue, Barnes asserts the Guaranty Agreement was not supported by
consideration. Where parties enter into a guaranty independent of the transaction that initially causes
an obligation, consideration independent of the obligation must support the guaranty. Material
P'ships, Inc. v. Ventura, 102 S.W.3d 252, 262 (Tex. App.--Houston [14th Dist.] 2003, pet. denied);
Gooch v. American Sling Co., 902 S.W.2d 181, 185 (Tex. App.--Fort Worth 1995, no writ). Barnes
contends the Guaranty Agreement is unenforceable for lack of new consideration to support his
independent guaranty because the Guaranty Agreement was executed long after the transaction that
created the underlying obligation had been consummated; that is, the Guaranty Agreement was
neither contemplated nor executed at the time the MGA Agreement was negotiated and Legacy was
appointed Old American's MGA.

 A written contract is presumed to be supported by consideration. Gooch v. American
Sling Co., 902 S.W.2d at 185. The burden is on Barnes to prove there was a failure of consideration. 
See id. 

 Old American, a county mutual, requires reinsurance to work with an appointed
MGA. See Tex. Ins. Code Ann. § 4053.102 (West 2009). Old American also demands its MGA 
provide a guaranty of the agency's performance. When Heartland terminated its reinsurance
agreement with Old American and was released from its guaranty of the business produced by
Legacy under the MGA Agreement, Barnes and the other co-owners of Legacy were faced with the
end of Legacy's ability to produce new business. Old American made the offer that, if Legacy found
a new reinsurer to assume the reinsurance risks from inception and if it obtained personal guaranties
of the business to replace the guaranty given by Heartland, Old American would allow Legacy to
continue writing new business. Barnes found a new reinsurer, Universal Re, that was willing to enter
into a reinsurance agreement under which it assumed the risks associated with the program from
inception. He also executed a guaranty of Legacy's performance that applied retroactively to the
inception of the MGA Agreement to replace the Heartland guaranty.

 Paragraph Four of the Guaranty Agreement (quoted above) sets forth the
consideration Barnes received in return for his guaranty: the appointment of Legacy as Old
American's MGA: (1) under the MGA Agreement, (2) under any amendments of the MGA
Agreement with Old American, and (3) under any subsequent agency agreements of any type. That
is, in exchange for Barnes's guaranty, Old American maintained and continued its appointment of
Legacy as its MGA under the MGA Agreement and under any future amendments to that Agreement. 
Legacy thus continued writing policies for Old American and earning commission dollars, and
Barnes, as an owner of Legacy, kept paying himself profit distributions from the commissions. We
find that, contrary to Barnes's contention, the Guaranty Agreement was supported by consideration. 
Barnes's third issue is overruled.


Prejudgment Interest


 Barnes in his fourth issue argues the trial court abused its discretion in awarding
common-law prejudgment interest on the non-arbitration contract damages. He contends the
Guaranty Agreement does not provide for prejudgment interest and that Old American failed to
request an award of prejudgment interest in its petition. He further asserts prejudgment interest is
not authorized by chapter 304 of the Texas Finance Code as those provisions apply only to property
damage, wrongful death, and personal injury cases. See Tex. Fin. Code Ann. § 304.102 (West 2006).

 We apply an abuse-of-discretion standard when reviewing the trial court's award of
prejudgment interest. Morales v. Morales, 98 S.W.3d 343, 348 (Tex. App.--Corpus Christi 2003, 
pet. denied). The standard of review for an abuse of discretion is whether the trial court acted
without reference to any guiding rules and principles, such that its ruling was arbitrary or
unreasonable. Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134 S.W.3d 835,
838-39 (Tex. 2004).

 Contrary to Barnes's assertion, Old American requested an award of prejudgment
interest in its petition. The trial court awarded $21,721.45 in prejudgment interest on the
commission adjustment amounts from December 12, 2005, the date the lawsuit was filed, through
the date judgment was signed. The trial court also awarded $30,599.76 in prejudgment interest on
the damages under the Dorinco agreement from September 19, 2006, the date Old American's
third amended petition containing a claim for money owned by Legacy under the Dorinco agreement
was filed, until the date judgment was signed. These calculations are consistent with the supreme
court's holding in Johnson & Huggins of Texas, Inc. v. Kenneco Energy that, under common law,
prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant
receives written notice of a claim or (2) the date suit is filed. 962 S.W.2d 507, 531 (Tex. 1998). 
Finding that the trial court's order in awarding prejudgment interest was neither arbitrary nor
unreasonable, we overrule Barnes's fourth issue.


Postjudgment Interest


 Barnes also argues the trial court erred by awarding Old American postjudgment
interest on the arbitration award. Prior to trial, an arbitration hearing was held for claims between
Old American and Austin Indemnity. After the arbitration panel issued its findings and award of
$914.652.85, Barnes acknowledged his personal responsibility to repay the claims. Old American
obtained an interlocutory partial-summary-judgment order in the amount of $899,625.85, which
reflected the amount of the award, less $15,000 previously paid by Barnes. In the trial court's final
order, it included postjudgment interest on the $899,625.85 arbitration-award amount, as well as on
the commission adjustment damages and the damages under the Dorinco agreement. Arguing the
trial court's award of postjudgment interest on the arbitration-award amount changed the arbitration
award, Barnes asserts the trial court erred in awarding postjudgment interest on the award amount
of $899,625.85. This Court has held that courts are not free to simply change an arbitrator's award. 
Cooper v. Bushong, 10 S.W.3d 20, 26 (Tex. App.--Austin 1999, pet. denied). At oral argument,
Old American conceded the trial court erred by awarding postjudgment interest on the arbitration-award amount. Finding that the trial court was precluded from interfering with the arbitrator's
jurisdiction and impermissibly modified the arbitrator's decision, we reverse the portion of the
trial court's order awarding postjudgment interest on the arbitration-award amount of $899,652.85
and render judgment that Old American take no postjudgment interest on the arbitration-award
amount of $899,652.85.


CONCLUSION

 We affirm in part the district court's order awarding damages, prejudgment interest,
and attorneys' fees and reverse that portion of the trial court's order awarding postjudgment interest
on the arbitration-award amount of $899,652.85 and render judgment that Old American recover no
postjudgment interest on the arbitration-award amount of $899,652.85.

 


 __________________________________________

 David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed in part; Reversed and Rendered in part

Filed: February 26, 2010
1. The loss ratio is the ratio of losses paid to premium earned. The lower the loss ratio, the
more profitable the business is to the insurance company.
2. The four reinsurers that followed Heartland were Universal Re, Austin Indemnity, Dorinco,
and AXA.