# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00404-CV

**Philip W. Barnes, Appellant**

**v.**

**Old American Mutual Fire Insurance Company, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. D-1-GN-05-004402, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Philip W. Barnes appeals from the trial court's order granting the motion of Old American Mutual Fire Insurance Company ("Old American") for directed verdict and awarding Old American damages, prejudgment and postjudgment interest, and attorneys' fees in a dispute arising from various nonstandard automobile insurance programs. We will affirm the trial court's order awarding damages, prejudgment interest, and attorneys' fees and will reverse that portion of the order awarding postjudgment interest on the arbitration-award amount of $899,652.85 and render judgment that Old American recover no postjudgment interest on the arbitration-award amount.

### FACTUAL AND PROCEDURAL BACKGROUND

The nonstandard automobile insurance market provides insurance for motorists who have poor credit histories, poor driving records, prior accidents, or other underwriting concerns that make it difficult for those motorists to obtain insurance through the traditional market. In Texas, the

nonstandard insurance market is structured through a tripartite relationship among a county mutual insurance company, a managing general agency ("MGA"), and one or more reinsurance companies. A county mutual insurance company ("county mutual") is an insurance carrier that is exempt from most state insurance laws. *See* Tex. Ins. Code Ann. § 912.002 (West 2009). The county mutual acts as the insurance carrier and allows its policies to be issued by its agents. In exchange for allowing policies to be issued pursuant to its authority to conduct the business of insurance, the county mutual receives a "front fee," that is, a percentage of the premiums written in a particular program.

From an operational standpoint, almost all the functions of administering a particular insurance program are delegated by a county mutual to its appointed MGA. The MGA conducts the majority of the business of the insurance program and is granted broad authority under the parties' MGA agreement to act on behalf of the insurance carrier. Among other functions, the MGA accepts insurance applications, underwrites applications, issues policies, collects premiums, pays commissions to retail agents, and adjusts and pays claims. Often, all or part of the obligations the MGA owes to the county mutual are supported by some form of guaranty agreement. Unlike the county mutual's compensation that is set out in the MGA agreement, the MGA's compensation is delineated in the reinsurance agreement between the county mutual and its reinsurer or reinsurers.

Reinsurance is a means whereby a company that issues an insurance policy can allocate or "cede" all or a portion of the risk it bears on that policy to another insurance company in return for a portion of the premium. *Great Atl. Life Ins. Co. v. Harris*, 723 S.W.2d 329, 330 (Tex. App.—Austin 1987, writ dism'd). Traditionally, 100 percent of the premiums written and losses incurred under a nonstandard insurance program are accepted by one or more reinsurers. In

2

this context, the county mutual is referred to as the "reinsured" or the "ceding carrier." The relationship between the ceding carrier and its reinsurers is governed by a reinsurance agreement.

This case concerns the extent to which a guaranty agreement signed by Barnes applies to various nonstandard automobile insurance programs. In 1993, Barnes formed the Heartland Lloyds Insurance Company ("Heartland") and served as its president. In February 2002, Barnes formed an MGA called Legacy Managing General Agency ("Legacy"). On April 30, 2002, Legacy entered into an MGA agreement ("MGA Agreement") with Old American, and Heartland agreed, effective May 1, 2002, to reinsure all the nonstandard automobile insurance business produced by Legacy for Old American. In addition, Barnes, as president of Heartland, signed a guaranty of performance of Legacy, effective May 1, 2002. On July 31, 2002, Barnes resigned as president of Heartland, and on August 12, 2002, Heartland terminated its reinsurance agreement with Old American, effective September 30, 2002.

On December 10, 2002, Old American signed a reinsurance agreement with Universal Reinsurance Company ("Universal Re"). Article 5.1 of the agreement brought about a novation; that is, Universal Re was substituted for Heartland, effective retroactively as of May 1, 2002. On December 12, 2002, Barnes executed an "absolute and unconditional" personal guaranty of Legacy's performance under the MGA Agreement with Old American ("Guaranty Agreement"), also effective retroactively as of May 1, 2002. On December 24, 2002, Old American released Heartland as reinsurer and guarantor of Legacy through an agreement and release, effective retroactively as of May 1, 2002.

During 2002 and 2003, Barnes took profit distributions from Legacy in the amount of $228,663.21. Then, in 2004, he formed Austin Indemnity Lloyds Insurance Company

3

("Austin Indemnity"), another reinsurance company. Barnes suggested to Old American that Austin Indemnity replace Universal Re as the reinsurer. He also proposed a commission adjustment agreement ("Commission Adjustment Agreement") to modify commission amounts earned by Legacy on all business produced for Old American. On September 2, 2004, Old American, Austin Indemnity, and Universal Re executed a novation agreement that substituted Austin Indemnity for Universal Re as the reinsurer of the Legacy program, effective retroactively as of May 1, 2002. Barnes now controlled both the producer (Legacy) and the reinsurer (Austin Indemnity) of the Legacy book of business. On October 1, 2004, Old American and Legacy signed the Commission Adjustment Agreement. If Legacy produced good business, that is, insurance business with a favorable loss ratio,[1] Legacy's commission would increase. If Legacy produced "bad" business, its commission rate would be adjusted downward.

Shortly thereafter, Barnes's relationship with his partners at Legacy began to deteriorate. On March 14, 2005, he resigned his management position with the company, although he retained his 38-percent ownership interest in Legacy and continued to function as its registered agent. On March 24, 2005, Austin Indemnity terminated its reinsurance agreement with Old American regarding the Legacy business. On April 1, 2005, Dorinco Reinsurance Company ("Dorinco") and AXA Re ("AXA") agreed to equally reinsure the Legacy business ("Dorinco agreement").

---

[1] The loss ratio is the ratio of losses paid to premium earned. The lower the loss ratio, the more profitable the business is to the insurance company.

4

On October 10, 2005, Old American made demand to Legacy for commission adjustment amounts due under the Commission Adjustment Agreement, losses that Old American calculated were $1,404,901.22 as of June 30, 2005. Legacy, however, failed to pay. On November 1, 2005, Old American made demand to Barnes under the Guaranty Agreement for payment of the Legacy commission adjustment amounts. When he failed to pay, Old American filed suit on December 12, 2005, alleging that Barnes had breached the Guaranty Agreement.

Old American instituted an arbitration action against Austin Indemnity in March 2006, alleging breach of the reinsurance agreement. Based on the Guaranty Agreement, the arbitration panel found Barnes liable to Old American for the amount of $914,652.85. He acknowledged liability, and that amount, reduced to $899,652.85 to reflect his one payment of $15,000, was made part of the final judgment in this case. On March 31, 2006, Barnes bought out the partners in Legacy, attaining 100-percent ownership interest in the company. The Dorinco and AXA reinsurance agreement was terminated effective April 15, 2006. On December 6, 2006, Old American made demand to Barnes as guarantor to pay the unpaid premium, fees, and taxes of $638,588.66 under the Dorinco and AXA reinsurance agreement.

After a jury trial in March 2007, the trial court granted Old American's motion for directed verdict, determining as a matter of law that the Guaranty Agreement applied to all transactions in question. Based on the jury verdict, the trial court also awarded Old American attorneys' fees and postjudgment interest, plus prejudgment interest on the commission adjustment and unpaid premium portions of the judgment. This appeal followed.

5

## DISCUSSION

### Standard of Review

Construction of an unambiguous contract is a question of law. *MCI Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650-51 (Tex. 1999). Neither Barnes nor Old American contended the Guaranty Agreement was ambiguous, and the trial court construed it as a matter of law. The standard of review in this case, therefore, is *de novo*. *See id.* at 651.

### Guaranty Agreement

In his first issue, Barnes argues the trial court erred when, as a matter of law, it construed the Guaranty Agreement to apply to each successive reinsurance program. He contends the scope of the Guaranty Agreement is limited to Legacy's obligations under the MGA Agreement between Old American and Heartland. Old American, however, asserts that, in consideration of Legacy's appointment as Old American's MGA under the MGA Agreement, Barnes absolutely and unconditionally guaranteed the performance of any and all of Legacy's obligations under the MGA Agreement and under any of its amendments.

In pertinent part, the Guaranty Agreement reads as follows:

> 2. Guarantor agrees to guarantee the performance of *any and all obligations of the [MGA]* under the [MGA] Agreement, including, without limitation, the payment of all funds owed to [Old American] insureds, finance companies, claimants, or agents by the [MGA] and *all [MGA's] balances arising pursuant to such [MGA] agreement.* This Guaranty expressly includes any reasonable attorneys' fees and expenses incurred by [Old American] by reason of the [MGA's] failure to satisfy any such obligation.

6

3. This Guaranty shall be absolute and unconditional. [Old American] shall have the right in its sole discretion to proceed against Guarantor for any indebtedness within the scope of this Agreement without first exhausting its remedies against the [MGA].

4. Guarantor hereby acknowledges the adequacy and receipt of [Old American's] appointment of [Legacy] as the [MGA] pursuant to the [MGA] Agreement, *any amendment to the [MGA] Agreement, and any subsequent agency agreements entered into by the parties herein* as valuable consideration for this Agreement. (Emphasis added.)

By guaranteeing Legacy's performance in exchange for Old American's appointment of Legacy as the MGA, pursuant to the MGA Agreement *and any amendments and subsequent alterations of its terms,* Barnes provided a continuing guaranty. A continuing guaranty is defined as follows:

> A continuing guaranty is one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, generally for an indefinite time or until revoked. It is simply a divisible offer for a series of separate unilateral contracts, and contemplates a series of transactions between a debtor and a creditor, rather than a single debt. A continuing guaranty is prospective in its operation and is generally intended to provide security with respect to future transactions within certain limits, and contemplates a succession of liabilities, for which, as they accrue, the guarantor becomes liable.

38A C.J.S. Guaranty, § 8, 583 (2008). *See also* 38 Am.Jur.2d, Guaranty, § 20, 887-88 (1999) (continuing guaranty can include subsequent indebtedness without new consideration being given).

7

Barnes's guaranty applied not only to the instant contractual relationship between Barnes and Old American but also to their future endeavors. His guaranty applied to "any and all" of Legacy's obligations and "all [of Legacy's] balances" arising under the MGA Agreement, which indicated the guaranty covered multiple transactions, with varying amounts due, at various times. The use of words or expressions guaranteeing "any and all" obligations or indebtedness indicates the guaranty is a continuing one. 38A C.J.S. Guaranty, § 63, 661-62 (1996). No time limit or duration is contained in either the Guaranty Agreement or the MGA Agreement, and there is no evidence that Barnes ever attempted to terminate the Guaranty Agreement. The continuing nature of Barnes's agreement implies his guaranty extended forward to cover all of Legacy's future obligations within the scope of the MGA Agreement.

Furthermore, only one MGA Agreement existed between Legacy and Old American. Barnes executed the Guaranty Agreement when Universal Re was about to take over reinsurance of Legacy's insurance business under a novation. Barnes not only knew about the novation, he helped draft the documents to accomplish it. Barnes signed the Guaranty Agreement and, as a result of his efforts, the MGA Agreement remained in effect for several years, with four different reinsurers.[2] The substitution of each new reinsurer simply worked an amendment of the MGA Agreement, which continued in effect until it was terminated in April 2006.

Barnes also asserts that the Guaranty Agreement could not be read to include amounts under the Commission Adjustment Agreement as that agreement was a separate agreement intended

---

[2] The four reinsurers that followed Heartland were Universal Re, Austin Indemnity, Dorinco, and AXA.

to change the way the reinsurer Austin Indemnity paid commissions. That is, Barnes contends the Commission Adjustment Agreement was not an amendment of the MGA Agreement and thus within the scope of the guaranty. Contrary to Barnes's argument, however, we find that the Commission Adjustment Agreement was an amendment of the MGA Agreement rather than an amendment of the Austin Indemnity reinsurance agreement. Article 3.7 of the MGA Agreement states that the commission may be amended upon mutual agreement of Old American and Legacy "without otherwise affecting the terms and conditions of this Agreement." The first paragraph of the Commission Adjustment Agreement declares that this adjustment of Legacy's commission applies to commissions for policies underwritten by Old American "under the [MGA] Agreement." Furthermore, the Commission Adjustment Agreement is signed by representatives of Old American and Legacy, not by representatives of Austin Indemnity. Because the commission adjustment amounts owed by Legacy to Old American were obligations incurred by Legacy under the MGA Agreement, they were covered by Barnes's guaranty under the Guaranty Agreement. Finding that the scope of the Guaranty Agreement is not limited to Legacy's obligations under the MGA Agreement between Old American and Heartland, we overrule Barnes's first issue.

**Dorinco Reinsurance Agreement**

In his second issue, Barnes argues the trial court erred when it held that the Dorinco reinsurance agreement was not a material alteration to the obligations underlying the Guaranty Agreement. A material alteration of a contract between a creditor and principal debtor is one that either actually injures or enhances the risk of injury to the guarantor. *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 326 (Tex. App.—El Paso 1995, writ denied); *Federal Deposit*

9

*Ins. Corp. v. Attayi*, 745 S.W.2d 939, 944 (Tex. App.—Houston [1st Dist.] 1988, no writ). *See United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 366 (Tex. 1968). Because a material alteration is an affirmative defense, the burden is on the guarantor to prove that a material alteration occurred. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The guarantor asserting the defense must demonstrate the following: (1) the existence of a material alteration to the underlying contract; (2) made without the guarantor's consent; (3) that is to the guarantor's detriment (that is, prejudicial to the guarantor's interest). *Id.*

Barnes maintains that the "unaffiliated reinsurance transaction" with Dorinco constituted a material alteration to the prior reinsurance programs and was not a risk he originally undertook. He contends the change in commission rates enhanced his risk of injury and had a negative impact on Legacy's performance. He asserts that the 17-percent provisional commission rate under the Dorinco agreement resulted in a cash-flow crisis at Legacy, led to improper commission advances and, ultimately, caused a default on payments to Dorinco. Moreover, Barnes contends that, not only did he not consent to the Dorinco transaction, he had resigned from Legacy at the time and was neither part of the negotiations nor knew of its terms. He thus argues that, because the Dorinco agreement prejudiced and harmed him, he was relieved of liability for the Dorinco balances under the Guaranty Agreement.

We find the trial court correctly held that Barnes's material-alteration defense failed as a matter of law. In consideration of Old American's appointment of Legacy as the MGA under the MGA Agreement and any of its subsequent amendments, Barnes gave his absolute, unconditional, and continuing guaranty of all of Legacy's obligations under the MGA Agreement.

10

The MGA Agreement allowed Legacy to issue policies, collect premiums and commissions, and adjust and pay claims related to automobile insurance policies on Old American policy forms. These activities are what the MGA Agreement governed in 2002 when Heartland and later Universal Re were the reinsurers; what it governed in 2004 when Austin Indemnity was the reinsurer; and what it governed in 2005 when Dorinco and AXA became the reinsurers. Although the Dorinco agreement changed the identity of the reinsurers of the business produced by Legacy and modified the provisional commission rate earned by Legacy, the essential characteristics of the MGA Agreement remained the same under the Dorinco agreement. Therefore, rather than a material alteration to the underlying contract, the Dorinco agreement was only an amendment to the MGA Agreement. Barnes's second issue is overruled.

**Guaranty Agreement Supported by Consideration**

In his third issue, Barnes asserts the Guaranty Agreement was not supported by consideration. Where parties enter into a guaranty independent of the transaction that initially causes an obligation, consideration independent of the obligation must support the guaranty. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 262 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Gooch v. American Sling Co.*, 902 S.W.2d 181, 185 (Tex. App.—Fort Worth 1995, no writ). Barnes contends the Guaranty Agreement is unenforceable for lack of new consideration to support his independent guaranty because the Guaranty Agreement was executed long after the transaction that created the underlying obligation had been consummated; that is, the Guaranty Agreement was neither contemplated nor executed at the time the MGA Agreement was negotiated and Legacy was appointed Old American's MGA.

A written contract is presumed to be supported by consideration. *Gooch v. American Sling Co.*, 902 S.W.2d at 185. The burden is on Barnes to prove there was a failure of consideration. *See id.*

Old American, a county mutual, requires reinsurance to work with an appointed MGA. *See* Tex. Ins. Code Ann. § 4053.102 (West 2009). Old American also demands its MGA provide a guaranty of the agency's performance. When Heartland terminated its reinsurance agreement with Old American and was released from its guaranty of the business produced by Legacy under the MGA Agreement, Barnes and the other co-owners of Legacy were faced with the end of Legacy's ability to produce new business. Old American made the offer that, if Legacy found a new reinsurer to assume the reinsurance risks *from inception* and if it obtained personal guaranties of the business to replace the guaranty given by Heartland, Old American would allow Legacy to continue writing new business. Barnes found a new reinsurer, Universal Re, that was willing to enter into a reinsurance agreement under which it assumed the risks associated with the program from inception. He also executed a guaranty of Legacy's performance that applied retroactively to the inception of the MGA Agreement to replace the Heartland guaranty.

Paragraph Four of the Guaranty Agreement (quoted above) sets forth the consideration Barnes received in return for his guaranty: the appointment of Legacy as Old American's MGA: (1) under the MGA Agreement, (2) under any amendments of the MGA Agreement with Old American, and (3) under any subsequent agency agreements of any type. That is, in exchange for Barnes's guaranty, Old American maintained and continued its appointment of Legacy as its MGA under the MGA Agreement and under any future amendments to that Agreement.

12

Legacy thus continued writing policies for Old American and earning commission dollars, and Barnes, as an owner of Legacy, kept paying himself profit distributions from the commissions. We find that, contrary to Barnes's contention, the Guaranty Agreement was supported by consideration. Barnes's third issue is overruled.

**Prejudgment Interest**

Barnes in his fourth issue argues the trial court abused its discretion in awarding common-law prejudgment interest on the non-arbitration contract damages. He contends the Guaranty Agreement does not provide for prejudgment interest and that Old American failed to request an award of prejudgment interest in its petition. He further asserts prejudgment interest is not authorized by chapter 304 of the Texas Finance Code as those provisions apply only to property damage, wrongful death, and personal injury cases. *See* Tex. Fin. Code Ann. § 304.102 (West 2006).

We apply an abuse-of-discretion standard when reviewing the trial court's award of prejudgment interest. *Morales v. Morales*, 98 S.W.3d 343, 348 (Tex. App.—Corpus Christi 2003, pet. denied). The standard of review for an abuse of discretion is whether the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).

Contrary to Barnes's assertion, Old American requested an award of prejudgment interest in its petition. The trial court awarded $21,721.45 in prejudgment interest on the commission adjustment amounts from December 12, 2005, the date the lawsuit was filed, through the date judgment was signed. The trial court also awarded $30,599.76 in prejudgment interest on

13

the damages under the Dorinco agreement from September 19, 2006, the date Old American's third amended petition containing a claim for money owned by Legacy under the Dorinco agreement was filed, until the date judgment was signed. These calculations are consistent with the supreme court's holding in *Johnson & Huggins of Texas, Inc. v. Kenneco Energy* that, under common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. 962 S.W.2d 507, 531 (Tex. 1998). Finding that the trial court's order in awarding prejudgment interest was neither arbitrary nor unreasonable, we overrule Barnes's fourth issue.

**Postjudgment Interest**

Barnes also argues the trial court erred by awarding Old American postjudgment interest on the arbitration award. Prior to trial, an arbitration hearing was held for claims between Old American and Austin Indemnity. After the arbitration panel issued its findings and award of $914.652.85, Barnes acknowledged his personal responsibility to repay the claims. Old American obtained an interlocutory partial-summary-judgment order in the amount of $899,625.85, which reflected the amount of the award, less $15,000 previously paid by Barnes. In the trial court's final order, it included postjudgment interest on the $899,625.85 arbitration-award amount, as well as on the commission adjustment damages and the damages under the Dorinco agreement. Arguing the trial court's award of postjudgment interest on the arbitration-award amount changed the arbitration award, Barnes asserts the trial court erred in awarding postjudgment interest on the award amount of $899,625.85. This Court has held that courts are not free to simply change an arbitrator's award. *Cooper v. Bushong*, 10 S.W.3d 20, 26 (Tex. App.—Austin 1999, pet. denied). At oral argument,

14

Old American conceded the trial court erred by awarding postjudgment interest on the arbitration-award amount. Finding that the trial court was precluded from interfering with the arbitrator's jurisdiction and impermissibly modified the arbitrator's decision, we reverse the portion of the trial court's order awarding postjudgment interest on the arbitration-award amount of $899,652.85 and render judgment that Old American take no postjudgment interest on the arbitration-award amount of $899,652.85.

## CONCLUSION

We affirm in part the district court's order awarding damages, prejudgment interest, and attorneys' fees and reverse that portion of the trial court's order awarding postjudgment interest on the arbitration-award amount of $899,652.85 and render judgment that Old American recover no postjudgment interest on the arbitration-award amount of $899,652.85.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed in part; Reversed and Rendered in part

Filed: February 26, 2010

15